DOYLE, Appellee and Cross–Appellant,

v.

FAIRFIELD MACHINE COMPANY, INC. et al., Appellants and Cross–Appellees.

[Cite as *Doyle v. Fairfield Machine Co., Inc.* (1997), 120 Ohio App.3d 192.]

Court of Appeals of Ohio,
Eleventh District, Trumbull County.

No. 96–T–5488.

Decided May 5, 1997.

194

198

*Ellen S. Simon,* for appellee and cross-appellant.

*Nicholas D. Satullo, Donald J. Moracz, Beverly Sandacz* and *Phillip J. Campanella,* for appellants and cross-appellees.

NADER, Judge.

This is an appeal from a jury trial in the Trumbull County Court of Common Pleas awarding plaintiff-appellee, Matthew Doyle, a $1.4 million verdict against defendants-appellants Fairfield Machine Company, Inc. ("Fairfield"), its president and CEO, Alexander Shashaty, its controller, James Hynes, and its independently run subsidiary, Northeast Fabricators, Inc. ("Northeast").[1]

1. Cyril Bath ("Cyril") was another independently run subsidiary of Fairfield and was sold by Shashaty late in 1991.

Matthew Doyle was employed by State Mutual Life Assurance Company ("State Mutual") in September 1980. After a short training period, Doyle was appointed group insurance representative with a compensation package that based his salary upon his productivity in selling group insurance. Doyle's employment record was clean, and his compensation, over $100,000 in 1989, had increased every year, with the exception of the year 1990, in which his father-in-law was being treated for cancer.

James Hynes was employed by Fairfield in December 1989, to serve as the controller for Fairfield, Northeast and Cyril.[2] Alexander Shashaty handpicked Hynes for this position. One of Hynes's first duties was to find group health insurance for Fairfield, after learning Fairfield's system and balancing its account records. Hynes was required to locate group health insurance for Fairfield because Fairfield's current health insurance carrier, Blue Cross/Blue Shield of Northern Ohio, indicated it would raise the premiums for all Fairfield employees based upon Fairfield's recent claims history. When Blue Cross/Blue Shield notified Hynes of this premium increase, it supplied him with a claims history for Fairfield employees over an eight-month period which showed each claim for each employee.[3] The claims reflected some serious health problems for several Fairfield employees and their dependents. For instance, Stephen McNally's youngest son, Sean, suffered from congenital central hypoventilation syndrome, which causes serious breathing abnormalities. He must submit to a bronchoscopy every six months so that his trachea will not close. In addition, Sean must wear a respirator while he sleeps because his respiratory system literally shuts down while he sleeps. This condition is permanent. Also, Curtis Petrey's wife, Louise,[4] suffered from late-stage cancer, which required radical, aggressive treatment. Moreover, Shashaty also suffered from a serious cardiac condition, which required several bypass surgeries.

When Hynes realized he would need to search for more economically feasible group health coverage, he contacted several independent insurance sales agents, including Sophocles Sophocleous of Alpha Benefits.[5] He provided Sophocleous with the claims history provided him by Blue Cross/Blue Shield for the period of April to November 1989. First, Sophocleous contacted Atlantic Administrators,

---

**2.** Throughout this opinion, Fairfield, Northeast and Cyril will be collectively referred to as "Fairfield."

**3.** The claims history report contains twenty-seven pages.

**4.** Louise Petrey is now deceased.

**5.** Sophocleous and Alpha Benefits were named by defendants as third-party defendants. Sophocleous's and Alpha Benefits' motions for summary judgment were granted on February 7, 1995.

Fairfield's interim insurer, a self-funded plan.[6] Hynes testified that he was unaware that the Atlantic Administrators plan was self-funded until many of Fairfield's claims were denied. Actually, there was approximately $200,000 in claims that were unpaid. As a result, Hynes began to search for another group insurance plan. Again, Hynes contacted Sophocleous and other independent sales agents to obtain proposals from different insurance carriers. Sophocleous then contacted Hynes and requested that he distill the information in the large claims history into a one-page report so that he could submit the request to State Mutual that afternoon, stating that the claims history was too cumbersome. Upon receiving this request, Hynes condensed the information in the twenty-seven-page report into one-half page, which listed the total claims submitted for each company during that time period.

Approximately one week after Hynes submitted this condensed statement to Sophocleous, he received a proposal from State Mutual that was very attractive, falling within the company's annual budget of approximately $300,000. Hynes scheduled a meeting during which he would complete a detailed application that would provide a more accurate premium schedule. At this meeting, held on August 27, 1990, in Hynes's office at Fairfield, were Hynes, Sophocleous and Doyle. During the meeting, Doyle orally presented the application to Hynes by asking him the questions contained in the application, then transcribing Hynes's responses. At all times, the detailed claims history was in a file cabinet in Hynes's office. At no time did Doyle request a copy of the claims history from Hynes; however, there was evidence that Doyle may have received a claims history.

The portion of the application that has served as the source of this action involved two "gatekeeper" questions, as the parties call them. The first of these two questions was "Have any employees or dependents incurred $5,000 or more in claims during the last 12 months?" Hynes answered this question "No." The second question queried, "Has any person to be insured been treated for a serious illness which is not included in the details of [the previous question]?" Hynes also answered this question "No." In his testimony, however, Hynes claimed that he qualified these answers during this meeting, but could not remember any specifics of this qualification. Doyle and Sophocleous testified that Hynes stated the answers to these questions unequivocally. Hynes also testified that Doyle left only one page of the application regarding some COBRA-

---

6. A self-funded plan, or multiemployer welfare association ("MEWA"), is one in which a group of companies combine to provide health coverage without an insurance company or policy. They pay all claims out of their current operating expenses. Many of these plans have stop-loss insurance, which pays all claims over a certain amount, leaving the MEWA responsible for only a set amount, after which the insurance coverage is activated.

covered employees with him to complete after reviewing company documents. To the contrary, Doyle testified that he left the entire application with Hynes to complete at a later date. In either case, Hynes's signature appears on the last page of the State Mutual application.

At the close of the meeting, Hynes presented Doyle with a "letter of binding" to sign. This letter, according to Hynes, was drafted in response to a situation in which Fairfield found itself without life insurance benefits because it did not have "something in writing" during the pendency of its life insurance application. Shashaty contradicted this testimony by saying the letter was intended to bind State Mutual to coverage immediately, even though Shashaty admitted that he was aware that an agent like Doyle did not have the authority to bind coverage. Doyle testified that he told Hynes that he had no authority to sign the letter, but Hynes insisted it was just a favor to satisfy Shashaty and that it would not "come back to haunt" Doyle. Doyle signed the letter because he felt Fairfield had a "clean application" and there should be no problem underwriting their group health insurance. Doyle did not retain a copy of the letter for his own files or for State Mutual's files.

Shortly after the meeting, Louise Petrey called State Mutual to request preapproval for some experimental chemotherapy treatment with a follow-up bone marrow transplant.[7] Upon learning of the treatment Petrey sought, Doyle immediately contacted Hynes to inquire whether there was an error in the application. Doyle surmised that Louise Petrey's condition was advanced due to the nature of the treatment she was seeking. When asked, Hynes merely inquired whether this "new" information would affect Fairfield's application and eligibility for insurance with State Mutual. Upon receiving this information, State Mutual declined to offer group coverage to Fairfield.

Within one month after State Mutual denied coverage to Fairfield, Hynes completed an application for group insurance with New York Life. Again, Hynes failed to disclose the serious medical conditions of its employees and their dependents. This time, however, New York Life provided coverage. After one year of coverage, New York Life significantly raised Fairfield's premiums due to the claims history generated in the previous twelve months. Evidence of this subsequent application was submitted, over objection, at trial.

On November 29, 1990, after State Mutual denied coverage to Fairfield, Hynes filed a grievance with the Ohio Department of Insurance stating:

"It is my contention that Fairfield Machine had a binding contract at September 1, 1990 or at least was deceived into believing so and that State Mutual is

---

7. Atlantic Administrators had already approved the treatment.

responsible for any and all claims incurred during the month of September 1990 and for the $100,000 of additional cost to Fairfield Machine which was a direct result of their actions."

The Ohio Department of Insurance sent a copy of this letter to State Mutual. Shortly thereafter, in January 1991, Lawrence Blanchard, Vice President of Employee Benefit Services at State Mutual, asked Doyle to resign or be fired. Blanchard stated that Doyle was fired because of a series of events that caused Doyle to lose credibility with the underwriting staff. Blanchard cited four events that led to this credibility problem. First, Doyle signed an application on behalf of a client, the president of Ives & Associates, who had previously completed and signed an application but due to changes in benefits was required to complete another application with somewhat different inquiries. There was conflicting testimony whether Doyle had authority to do so. Second, Doyle's productivity declined in 1990, due to the illness of his father-in-law. Third was the letter of binding and complaint to the Ohio Department of Insurance regarding State Mutual. Fourth was Doyle's involvement in underwriting insurance for a company that leased employees (a temporary agency), R.E. Lowe/Tailored Management. Testimony was elicited, however, that this final act occurred after Doyle resigned from State Mutual. Further, the testimony also showed that, in the case of the Ives & Associates and R.E. Lowe accounts, State Mutual had accepted these applications and provided group insurance to these companies.

After he resigned from State Mutual, Doyle did not apply for unemployment compensation. He also did not apply for any jobs involving insurance sales because he feared he would be unable to be licensed with another company due to the pending complaint with the Department of Insurance. The complaint was later dismissed by the Department of Insurance.

Instead, Doyle attempted to start a galvanized steel supply business with his brother, but that business failed almost immediately. Mrs. Doyle abandoned their decision that she would remain at home when she took a full-time job in order to support the family, which included the Doyles's two daughters. The Doyles also had to sell their large home and resided with a friend until they could afford different living arrangements. Eventually, Mr. Doyle was able to find employment with an insurance company, Summit Benefits, which he left after six or seven months to take a position with a new pharmacy-benefit-management firm, SRX. As Vice President of Sales for SRX, Doyle earned a salary of $36,000 in 1994; Doyle's compensation package with SRX also includes commissions earned, which he declined to accept in 1994. Together the Doyles earned approximately $60,000 in 1994.

On November 26, 1991, Doyle filed a complaint in the Cuyahoga County Common Pleas Court against Fairfield Machine Company and Hynes alleging

intentional misrepresentation (fraud), negligent misrepresentation, defamation, and intentional or tortious interference with Doyle's employment relations with State Mutual,[8] seeking compensatory and punitive damages.[9] Due to improper venue, the case was transferred to the Trumbull County Court of Common Pleas. After receiving the court's permission, Doyle filed an amended complaint on February 8, 1993, adding Alexander Shashaty and Northeast Fabricators as defendants. In response, all defendants jointly requested and were granted leave to file a third-party complaint against Alpha Benefits and Sophocles Sophocleous claiming they were responsible for the injury caused to Doyle in contribution or indemnification. All parties filed motions for summary judgment. On February 7, 1995, defendants'/third-party plaintiffs'[10] motion for summary judgment was granted on Doyle's negligent misrepresentation and defamation claims, but denied on his intentional misrepresentation (fraud) and tortious interference claims. Third-party defendants' motion for summary judgment on appellants' third-party complaints was also granted on that day.

Before trial, appellants filed three motions *in limine* requesting that the court deny Doyle[11] the opportunity to introduce the expert testimony of Charles Hocevar, Jr., who would testify as to lost income, and present evidence, both in the form of testimony and documentation, of Hynes's subsequent application to New York Life, which also contained similar incorrect statements regarding Fairfield's claims history. All motions were overruled on June 12, 1995, in chambers just before jury selection.

The case proceeded to a trial before a jury on June 12, 1995. After four days of trial, the jury returned a judgment against appellants, awarding appellee $1.4 million in compensatory damages including $650,000 for emotional distress. On June 20, 1995, appellee moved for prejudgment interest. On June 30, 1995, appellants moved for a judgment notwithstanding the verdict pursuant to Civ.R. 50(B) or in the alternative a new trial pursuant to Civ.R. 59, both of which were denied on July 31, 1995. On August 22, 1995, appellants filed a notice of appeal in this court, which was dismissed on February 29, 1996, for lack of a final appealable order as the motion for prejudgment interest remained pending in the common pleas court. After a hearing on the matter, appellee's motion for

---

8. The claim of intentional or tortious interference with a business or employment relationship will be referred to as "tortious interference" throughout this opinion.

9. The claim for punitive damages was later voluntarily dismissed on June 15, 1996, the last day of trial.

10. Hynes, Shashaty, Fairfield and Northeast, defendants below, will be referred to as "appellants" throughout the remainder this opinion.

11. Doyle, plaintiff below, will be referred to as "appellee" for the remainder of this opinion.

prejudgment interest was denied on June 4, 1996. Appellants timely appealed, asserting seven assignments of error:

"1. The trial court erred in denying defendants' motion for summary judgment on the issues of fraud and interference with an employment relationship."

"2. The trial court erred in denying defendants' motion for directed verdict."

"3. The trial court erred in admitting evidence regarding an insurance application submitted to another company after the date of the relevant events."

"4. The trial court erred in denying defendants' motion for judgment notwithstanding the verdict."

"5. The trial court erred in instructing the jury on the claim of fraud."

"6. The trial court erred in instructing the jury on the claim for intentional interference with an employment relationship."

"7. The trial court erred in instructing the jury on emotional distress damages."

Appellee asserts the following assignment of error on cross-appeal:

"The court's failure to award prejudgment interest was an abuse of discretion."

Appellants, for their first, second, and fourth assignments of error, contend that the trial court erred by failing to grant their motion for summary judgment, motion for directed verdict, and motion for judgment notwithstanding the verdict on the claims of fraud and tortious interference. The standard for reviewing whether a motion for summary judgment is appropriate and the standard for reviewing a motion for a directed verdict mirror one another. An appellate court, in reviewing the propriety of either motion, is to construe the evidence presented most strongly in favor of the nonmoving party and, after doing so, determine whether reasonable minds could conclude only against the nonmoving party. Compare *Osborne v. Lyles* (1992), 63 Ohio St.3d 326, 327, 587 N.E.2d 825, 827, with *Coons v. Clark* (Oct. 4, 1996), Trumbull App. No. 96–T5440, unreported, at 11, 1996 WL 586418.

"In considering a motion for a directed verdict, a court does not weigh the evidence or test the credibility of the witnesses. Such a motion ' * * * is in the nature of a demurrer to the evidence and assumes the truth of the evidence supporting the facts essential to the claim of the party against whom the motion is directed, and gives to that party the benefit of all reasonable inferences from that evidence.' " *Becker v. Lake Cty. Mem. Hosp. West* (1990), 53 Ohio St.3d 202, 206, 560 N.E.2d 165, 169, quoting *Ruta v. Breckenridge–Remy Co.* (1982), 69 Ohio St.2d 66, 68, 23 O.O.3d 115, 116, 430 N.E.2d 935, 938.

Where there is evidence from which reasonable minds could come to different conclusions, summary judgment and directed verdict are inappropriate. *Osborne,* 63 Ohio St.3d 326, 587 N.E.2d at 826–827.

Moreover, the standard for reviewing a judgment notwithstanding the verdict is the same as that applicable to a motion for a directed verdict. *Gladon v. Greater Cleveland Regional Transit Auth.* (1996), 75 Ohio St.3d 312, 318, 662 N.E.2d 287, 294.

" ' The evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon either of the above motions.' " *Id.,* quoting *Posin v. ABC Motor Court Hotel, Inc.* (1976), 45 Ohio St.2d 271, 275, 74 O.O.2d 427, 429–430, 344 N.E.2d 334, 338. See, also, *State v. Loza* (1994), 71 Ohio St.3d 61, 69, 641 N.E.2d 1082, 1096; *Bechtol v. Bechtol* (1990), 49 Ohio St.3d 21, 23, 550 N.E.2d 178, 180; *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus (credibility of the witnesses and the weight of the evidence is the proper province of the jury).

With these standards in mind, appellants contest whether any one of these motions should have been granted on the fraud and tortious interference claims.

In order to prevail upon a claim of fraud a plaintiff must show all of the following elements:

"(a) a representation or, where there is a duty to disclose, concealment of a fact,

"(b) which is material to the transaction at hand,

"(c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,

"(d) with the intent of misleading another into relying upon it,

"(e) justifiable reliance upon the representation or concealment, and

"(f) a resulting injury proximately caused by the reliance." *Burr v. Bd. of Cty. Commrs. of Stark Cty.* (1986), 23 Ohio St.3d 69, 23 OBR 200, 491 N.E.2d 1101, paragraph two of the syllabus, citing *Cohen v. Lamko, Inc.* (1984), 10 Ohio St.3d 167, 10 OBR 500, 462 N.E.2d 407.

When seeking money damages, a plaintiff is required to plead and prove these elements by a preponderance of the evidence. *Household Fin. Corp.*

*v. Altenberg* (1966), 5 Ohio St.2d 190, 34 O.O.2d 348, 214 N.E.2d 667, syllabus. Fraud is never presumed, but must instead be affirmatively proved. *Beneficial Fin. Co. v. Smith* (1968), 15 Ohio App.2d 208, 210, 44 O.O.2d 368, 369–370, 240 N.E.2d 106, 107–108.

Appellants, in their brief, do not dispute proof of the first two elements: that there was a representation that was material to the transaction at hand. Appellants, rather, challenge proof of the elements of knowledge of falsity, intent to mislead, justifiable reliance, and proximate cause.

 In defending their position that Hynes did not know of the falsity of the statement contained in the State Mutual application or intentionally deceive or mislead appellee, appellants have advanced the theory of the "Innocent Construction Rule." Appellants maintain in their brief that the "law mandates a presumption of honesty. * * * '[W]here the facts present a double aspect, one consistent with fair dealing and the other involving dishonesty of purpose, the court, unless the scale decidedly predominates for the latter, will strike the balance in favor of honesty and innocence.'" Appellants' brief, at 17, quoting *Compressed Gas Corp. v. United States Steel Corp.* (C.A.6, 1988), 857 F.2d 346, 350. However, in the *Compressed Gas* case, the Sixth Circuit Court of Appeals was interpreting *Kentucky* law. Ohio law does not support a rule of innocent construction that presumes honesty and requires courts to grant a motion for summary judgment or direct a verdict in favor of defendants when the plaintiff presents evidence which could very likely lead to either conclusion.

The Ohio cases that appellants cite state the following:

"Fraud or bad faith is never presumed, and where two constructions of an employer's writing are possible, one of which requires a finding of fraudulent intent or bad faith, and the other permits a conclusion of good faith, courts never hesitate in giving effect to the latter interpretation." *Bolling v. Clevepak Corp.* (1984), 20 Ohio App.3d 113, 20 OBR 146, 484 N.E.2d 1367, paragraph eight of the syllabus. See, also, *Sigman v. Rudolph Wurlitzer Co.* (1937), 57 Ohio App. 4, 7, 10 O.O. 17, 18, 11 N.E.2d 878, 879.

These cases both dealt with interpretation of provisions in a contract between an employer and an employee. In neither case was there a claim brought for an intentional tort. The presumption of honesty and the innocent-construction rule have been applied to cases wherein the court is attempting to interpret various provisions of a contract.

 In the context of fraud claims, a plaintiff has the burden to prove that defendant knowingly and intentionally misled or deceived plaintiff. Fraudulent conduct may not be established by conjecture; it must be proved by direct evidence or justifiable inferences from established facts. *Pumphrey v. Quillen*

(1955), 102 Ohio App. 173, 177, 2 O.O.2d 152, 154–155, 141 N.E.2d 675, 679–680, affirmed (1956), 165 Ohio St. 343, 59 O.O. 460, 135 N.E.2d 328. When the plaintiff fails to produce sufficient evidence from which a jury could find in his favor, a motion for summary judgment is appropriate. This is a principle of application of the burden of proof; it is not a legal presumption. Therefore, the innocent-construction rule does not apply in a tort fraud context.

In proving knowing falsity and intent to mislead or deceive, a plaintiff is not necessarily required to present direct evidence, such as a confession by the tortfeasor that he knowingly deceived plaintiff. Rather, a plaintiff may present circumstantial evidence to show the required knowledge or intent.

"If a person makes a representation not knowing whether it is true or false, he cannot be considered as innocent, since a positive assertion of a fact is, by plain implication, an assertion of knowledge concerning the fact." *Pumphrey,* 165 Ohio St. at 347, 59 O.O. at 462, 135 N.E.2d at 331.

"In an action for damages predicated upon false representation, a case may be made against one * * * who misstates his own state of mind * * * as by saying that he knows [a fact's] existence when he is conscious that he merely believes it to exist, or has no belief one way or the other of its truth or falsity * * * [or] who asserts a fact as of his own knowledge, or so positively as to imply that he has knowledge, when he knows that he has not sufficient information to justify it." *Pumphrey,* 102 Ohio App. 173, 2 O.O.2d 152, 141 N.E.2d 675, paragraph one of the syllabus. See, also, *Mohler v. Baker* (1950), 88 Ohio App. 461, 466, 45 O.O. 238, 240, 97 N.E.2d 683, 685 ("A positive statement implies knowledge, and if the party who makes it has no knowledge on the subject, he has told *scienter* what is untrue; he has affirmed his knowledge").

In this case, the plaintiff presented evidence that, if believed, would support a finding that Hynes knowingly or recklessly made false representations with the intent to deceive to obtain group health insurance coverage. For instance, even though Hynes stated that he made a mistake when he answered the gatekeeper questions in the negative, evidence was presented that he (1) previously generated a summary report of the information contained in the report, (2) shopped for group health insurance previously, (3) had the claims history reports in his office during the meeting with appellee and Sophocleous, and (4) knew that (i) Shashaty, his immediate supervisor with whom he had daily contact, was suffering from serious heart problems, and (ii) his employees's claims of over $200,000 were not being paid by their current carrier. The evidence also showed that Hynes was under tremendous pressure to obtain group health insurance for Fairfield at a low cost. Moreover, appellee presented evidence that appellants submitted a subsequent application to New York Life

within one month, which contained the same incorrect information Hynes admitted he knew was incorrect when he submitted it. Additionally, Hynes also testified that he did not know of the serious health problems of the Fairfield employees and their dependents when he completed the State Mutual application. Even assuming the truth of this assertion, there is evidence that Hynes answered these questions unequivocally. Under the reasoning of *Mohler, supra,* Hynes has himself supplied the required element of scienter—knowledge.

Without weighing the evidence or evaluating the credibility of the witnesses, and construing the evidence most strongly in favor of appellee, there was ample evidence that created a jury question on the issues of knowledge and intent, so that summary judgment, a directed verdict, and a judgment notwithstanding the verdict in favor of appellants would have been inappropriate on this issue.

■ In support of their position that appellee's reliance upon Hynes's representations was not justified, appellants contend that appellee knew he was not permitted to sign a letter of binding to immediately bind State Mutual to insurance coverage. Appellants assert that a party cannot profit from his own wrongful conduct, citing *Shrader v. Equitable Life Assur. Soc. of the United States* (1985), 20 Ohio St.3d 41, 44–45, 20 OBR 343, 345–347, 485 N.E.2d 1031, 1033–1035. As appellee correctly states in his appellate brief, *Shrader* concerns the ability of a murderer to obtain the benefits of a life insurance policy on the life of the person he murdered. Clearly, we are not presently dealing with such an egregious case. Appellee's conduct in signing the letter goes to the issue of justifiable reliance, as it shows that appellee in fact relied on Hynes's representations. It also goes to the issue of proximate cause. Regarding justifiable reliance, the issues are whether appellee should have known that the information Hynes provided was incorrect or incomplete and whether appellee should have asked to see more information.

Appellants produced evidence that appellee received the detailed claims history that he stated he never requested or received. This evidence was presented in the form of a fax allegedly sent by Alpha Benefits to Hynes approximately eleven days before the meeting in which appellee took Fairfield's application. In this fax, Sophocleus stated that State Mutual based its quote upon Fairfield's claims experience. Appellee attempted to rebut this evidence by showing that the crucial page did not contain a fax legend at the top of the sheet confirming the date, time, and page number.

Appellants also presented testimony from Blanchard and appellee that traditionally a group sales representative needs substantially more information to provide an accurate premium proposal than just the one-half-page summary of the Blue Cross/Blue Shield claims history provided by Hynes. Further, appellants contend that appellee's failure to ask for more information proves that he

was not justified in relying upon Hynes's assertions that the Fairfield employees did not suffer from any serious medical conditions or did not individually incur more than $5,000 in covered medical expenses the previous year.

 *Beneficial Fin. Co.*, *supra*, 15 Ohio App.2d 208, 44 O.O.2d 368, 240 N.E.2d 106, addresses the issue of justifiable reliance in this context. The issue in that case was whether "a party alleging fraud be said to have relied upon a false financial statement to his damage when such statement did not include a debt known by the aggrieved to exist." *Id.* at 210, 44 O.O.2d at 370, 240 N.E.2d at 108. The court held that the plaintiff was not justified in relying on the false statement because he knew that the information was incomplete.

"No lender who is fully aware of an omission in a statement intended to induce the granting of a loan can be said either to have been reasonably cautious or prudent or to have trusted the statement." *Id.* at 211, 44 O.O.2d at 370, 240 N.E.2d at 108.

The *Beneficial Fin. Co.* court held that the omission should have been brought to the defendants' attention.

"[W]ant of caution on the part of a person claiming to have been defrauded will prevent assertion of rights under some circumstances." *Id.* at 211, 44 O.O.2d at 370, 240 N.E.2d at 108, citing *McHenry v. Old Citizens Natl. Bank* (1911), 85 Ohio St. 203, 97 N.E. 395.

Conversely, in this case, there was evidence that rebutted appellants' showing that appellee actually knew of the missing information, which would trigger a duty in appellee to request additional information. Although appellee would have been well advised to request documentation of Fairfield's claims history, there was evidence in the record from which the jury could find justifiable reliance. Therefore, summary judgment, a directed verdict, and a judgment notwithstanding the verdict in favor of appellants would have been inappropriate on these issues.

 Finally, appellants contend that the representation was not the proximate cause of appellee's termination. Proximate cause has been defined as follows:

"[A]n act or failure to act which in the natural and continuous sequence directly produces the [injury] claimed, and without which it would not have occurred. Cause occurs when the [injury] is the natural and foreseeable result of the act or failure to act." 11 Ohio Jury Instructions (1995) 171, Section 11.10(2).

" '[T]he term "proximate cause," is often difficult of exact definition as applied to the facts of a particular case. However, it is generally true that, where an original act is wrongful * * * and in a natural and continuous sequence produces

a result which would not have taken place without the act, proximate cause is established, and the fact that some other act unites with the original act to cause injury does not relieve the initial offender from liability.'" *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 287, 21 O.O.3d 177, 180, 423 N.E.2d 467, 471, quoting *Clinger v. Duncan* (1957), 166 Ohio St. 216, 222, 2 O.O.2d 31, 34, 141 N.E.2d 156, 162.

Even where an act is not the sole cause of the injury, that act can still be sufficient to satisfy the element of proximate cause so long as it put in motion the sequence of events leading to the injury. *Garbe v. Halloran* (1948), 150 Ohio St. 476, 38 O.O. 325, 83 N.E.2d 217, paragraph two of the syllabus.

 Appellants have argued that appellee's own wrongful act of signing the binding letter without the authority to do so is the cause of his termination. In effect, this argument propounds that appellee's act intervened to break the causal connection between Hynes's wrongful act and appellee's injury. Intervening causation has been explained as follows:

" 'Where there intervenes between an agency creating a hazard and an injury resulting from such hazard another conscious and responsible agency which could or should have eliminated the hazard, the original agency is relieved from liability. A break in the chain of causation thereby takes place which operates to absolve the original agency.'" *Cascone v. Herb Kay Co.* (1983), 6 Ohio St.3d 155, 159, 6 OBR 209, 213, 451 N.E.2d 815, 819, quoting *Thrash v. U–Drive–It Co.* (1953), 158 Ohio St. 465, 49 O.O. 402, 110 N.E.2d 419, paragraph two of the syllabus.

" 'If an injury is the natural and probable consequence of a negligent act and it is such as should have been foreseen in the light of all the attending circumstances, the injury is then the proximate result of the negligence. It is not necessary that the defendant should have anticipated the particular injury. It is sufficient that his act is likely to result in an injury to someone.'" *Id.* at 160, 6 OBR at 213, 451 N.E.2d at 819, quoting *Mudrich v. Std. Oil Co.* (1950), 153 Ohio St. 31, 39, 41 O.O. 117, 121, 90 N.E.2d 859, 863.

In sum, if the intervening act is not foreseeable, the causal link is broken and appellants are relieved of liability. There may be more than one proximate cause of an injury. *Taylor v. Webster* (1967), 12 Ohio St.2d 53, 57, 41 O.O.2d 274, 276, 231 N.E.2d 870, 873; *Erie Cty. United Bank v. Berk* (1943), 73 Ohio App. 314, 317, 28 O.O. 500, 501, 56 N.E.2d 285, 287. Where there are facts that could lead reasonable minds to conclude differently regarding whether the intervening cause broke the causal link, the question should be submitted to the jury, and summary judgment is not appropriate. *Cascone, supra,* at paragraph two of the syllabus. In a case based upon an intentional tort such as fraud or tortious interference,

however, where the intervening act complained of is the act of the plaintiff, an analysis of intervening cause is tantamount to a comparative negligence claim, which is no defense to an intentional tort. See *Hardiman v. Zep Mfg. Co.* (1984), 14 Ohio App.3d 222, 14 OBR 250, 470 N.E.2d 941, paragraph two of the syllabus (holding invalid an instruction regarding intervening cause of act of plaintiff as a defense to strict liability in a case when the former contributory negligence may have been a defense).

The evidence in the instant case showed that appellee was terminated for four reasons, three of which appellee attempted to rebut as spurious, mere pretext. First, appellants presented the testimony of Blanchard, who stated that appellee was asked to resign because he signed an application for the president of Ives & Associates, who had already applied for a different form of insurance with State Mutual. The testimony revealed, however, that appellee may have been permitted to do so. Further, evidence was presented that State Mutual ultimately granted coverage to this company. Moreover, appellee was offered a promotion soon after the incident. Second, appellant presented evidence that appellee was forced to resign due to his attempt to gain coverage through State Mutual for a temporary employment agency. Although this event was stated as a ground for appellee's termination, appellee effectively rebutted it as a ground for termination primarily because he left State Mutual before this event took place. Evidence was also presented that providing coverage for a temporary employment agency was not a prohibited practice and that State Mutual ultimately granted coverage to this company. Third, Blanchard testified that appellee's productivity was down. The testimony also revealed that appellee's father-in-law was terminally ill and he took some time from work to spend with his family without negative comment by his superiors. Also testimony was presented that appellee was an exemplary employee with no formal or informal reprimands on his employment record with State Mutual. Reasonable minds could thus conclude that the only reason remaining for his termination was the complaint to the Department of Insurance and/or his signing the binding letter.

As suggested previously, the evidence suggests that obtaining the binding letter was the goal of Hynes's fraudulent representation. As a result, reasonable minds could conclude that appellee's signing of the binding letter was a foreseeable consequence of the misrepresentation, leaving appellants liable for the consequences. Further, since reasonable minds could conclude from the evidence presented that appellee was required to resign due to the complaint filed with the Ohio Department of Insurance, summary judgment, a directed verdict, and a judgment notwithstanding the verdict in appellants' favor were inappropriate.

Appellants also contend that it was error for the trial court to deny their motion for summary judgment, for a directed verdict, and for judgment notwith-

standing the verdict on the claim of tortious interference. Pursuant to the elements set forth in our discussion of appellants' sixth assignment of error below, appellee presented testimony that created an issue of fact for reasonable minds on each element of the claim for tortious interference. Accordingly, appellants' assignment of error in this regard is not well taken.

For the foregoing reasons, appellant's first, second, and fourth assignments of error are without merit.

■ For their third assignment of error appellants maintain that the trial court erred in overruling their objection to the admission of evidence of appellants' subsequent application to New York Life for group health insurance submitted to New York Life on September 21, 1990, less than one month after the State Mutual application was submitted and denied. Appellants object to the introduction of this evidence on relevancy grounds. We disagree.

■ Evidentiary issues are the proper province of the trial court. *State v. Keith* (Oct. 27, 1995), Ashtabula App. No. 95–A–0008, unreported, at 4. As such, evidentiary rulings will not be reversed absent an affirmative showing of abuse of discretion, a standard that connotes more than an error in judgment or law, but rather implies that the court's attitude was arbitrary, unreasonable, or unconscionable. *State v. Adams* (1980), 62 Ohio St.2d 151, 156, 16 O.O.3d 169, 172, 404 N.E.2d 144, 147–148.

Evidence that makes a fact of significance more or less likely is relevant and admissible absent the applicability of another evidentiary rule that will render the evidence inadmissible. Evid.R. 401. In addition to the other, more specific evidentiary rules, Evid.R. 403 provides that relevant evidence is inadmissible if its probative value is substantially outweighed by its prejudicial effect upon the case.

In this case, the evidence at issue was relevant to a key issue in the case. Appellee sought to introduce both testimonial and documentary evidence of the subsequent, erroneous health insurance application for the purpose of showing a plan or scheme and rebutting appellants' claim that Hynes merely made a mistake when he failed to disclose the serious health conditions of various Fairfield employees. This evidence was proper for impeachment and substantive purposes as it goes directly to two elements of appellee's fraud claim—knowledge of the falsity of the representation and intent to deceive. In addition, the proffered evidence was not too remote in time because the application was submitted within one month after the State Mutual application was submitted and rejected.

Even if appellants could claim that this evidence was "specific act" character evidence, offered to show that Hynes acted in conformity with his character to

deceive, Evid.R. 404(B) provides an exception to the general rule that character evidence is inadmissible.

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, *intent,* preparation, *plan, knowledge,* identity, or *absence of mistake or accident.*" (Emphasis added.) Evid.R. 404(B).

As stated previously, appellee introduced evidence of the subsequent erroneous application to New York Life to show intent, plan, knowledge, and absence of mistake, all of which go directly to the elements of knowledge of the falsity of the representation and intent to deceive or mislead. Consequently, appellants' evidentiary objection was properly overruled. Appellants' third assignment of error is meritless. .

Appellants' remaining assignments of error attack the trial court's instructions to the jury on the claims of fraud and tortious interference and on the issue of damages for emotional distress. Appellee filed proposed jury instructions in the trial court on June 14, 1995, during the trial. From the record before us it appears that appellants did not file any proposed jury instructions. Moreover, appellants failed to object to any of the jury instructions at any time during this action at the trial level, in contravention of Civ.R. 51(A), which provides:

"On appeal, a party may not assign as error the giving or failure to give any instruction unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection."

As a result, appellant has waived his right to appeal the erroneous jury instructions, *Schade v. Carnegie Body Co.* (1982), 70 Ohio St.2d 207, 24 O.O.3d 316, 436 N.E.2d 1001, paragraph one of the syllabus, unless we find plain error. *Id.* at 209, 24 O.O.3d at 317, 436 N.E.2d at 1002–1003. Erroneous jury instructions are not *per se* plain and reversible error. See, generally, *id.* The relevant inquiry in determining whether erroneous jury instructions constitute plain and reversible error is "whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights." *Becker,* 53 Ohio St.3d at 208, 560 N.E.2d 165. Stated slightly differently, the reviewing court's inquiry is whether "but for the error, the outcome of the trial clearly would have been otherwise." *In re Colvin* (June 6, 1994), Washington App. No. 93 CA 30, unreported, 1994 WL 258385; *Columbus v. McKarn* (Apr. 14, 1994), Franklin App. Nos. 93AP–984, 93AP–985, unreported, 1994 WL 130723; *Dayton v. Platt* (Jan. 23, 1989), Montgomery App. No. 10894, unreported, 1989 WL 5814. Further, the reviewing court is not to look at specific provisions of the jury

instructions; rather, the court is to look at the totality of the jury charge in determining whether the erroneous portion of it is harmless or so prejudicial as to warrant reversal. *Kurzner v. Sanders* (1993), 89 Ohio App.3d 674, 680, 627 N.E.2d 564, 567–568, citing *Schade v. Carnegie Body Co.* (1982), 70 Ohio St.2d 207, 24 O.O.3d 316, 436 N.E.2d 1001, and *State v. Price* (1979), 60 Ohio St.2d 136, 14 O.O.3d 379, 398 N.E.2d 772, paragraph four of the syllabus. See, also, *Becker,* 53 Ohio St.3d at 208, 560 N.E.2d at 170–171. Without a timely objection on the record, the prejudice allegedly created by the erroneous instructions must satisfy the plain error standard. *Yeazel v. Brown* (Feb. 23, 1996), Montgomery App. No. 15347, unreported, 1996 WL 76231.

Although appellants present an assignment of error regarding improper jury instructions on the fraud claim, the only argument in appellants' brief that even tangentially addresses these jury instructions is their argument based on the innocent-construction rule discussed previously. Because appellants have failed to persuade this court that Ohio recognizes the innocent-construction rule in a fraud context and because the trial court instructed the jury on the fraud claim consistent with the elements of fraud stated above, appellants' fifth assignment of error is not well taken.

For their sixth assignment of error, appellants attack the validity of the trial court's jury instructions on the claim of tortious interference. Again, appellants failed to object to the trial court's instructions at any time before the verdict was rendered. Thus, this error is waived unless appellants can affirmatively show plain error, as discussed above. The trial court instructed the jury as follows on the issue of tortious interference:

"You will find for the plaintiff if you find by the greater weight of the evidence, known as the preponderance of evidence [explained previously]; A, that there was an employment relationship between plaintiff and State Mutual Assurance Company; B, that the defendants knew of the employment relationship; C, that defendants acted with the intent to terminate the plaintiff's employment relationship or knew that the interference was certain or substantially certain to occur as a result of their actions; and, D, that the plaintiff was injured as a proximate result of the defendants' acts.

" * * * In addition to denying the allegations of tortious interference with employment relations, the defendants have asserted an affirmative defense of legal justification. The defendants have the burden of proof on this affirmative defense and must prove all the elements of the legal justification by a preponderance of the evidence * * *.

" * * * If you find the plaintiff has proved all the elements of interference with an employment relationship by the greater weight of the evidence and that

defendants have not proved a legal justification by a greater weight of the evidence, you will find for the plaintiff. However, if you find that the plaintiff has not proved all of the elements of interference with an employment relationship or that defendants have proven by a greater weight of the evidence a legal justification, you will find for the defendants on this claim."

The jury interrogatory that addressed the issue of justification reads as follows:

"Do you find the defendants have proven by a preponderance of the evidence their affirmative defense of legal justification?"

Seven of the eight jurors found that appellants did not sustain their burden of proof. The jury was not instructed on any privilege that may have existed by virtue of appellants' filing a complaint with the Ohio Department of Insurance.

Appellee and the trial court obtained the jury instructions on the tortious interference claim from 3 Ohio Jury Instructions (1995), Section 302.03, at 17. Several Ohio courts also seem to use this scheme in claims of tortious interference.

The Restatement of the Law 2d, Torts, which has guided Ohio courts in the development of the law regarding tortious interference, *Walter v. Murphy* (1988), 61 Ohio App.3d 553, 555, 573 N.E.2d 678, 679, and *Juhasz v. Quik Shops, Inc.* (1977), 55 Ohio App.2d 51, 9 O.O.3d 216, 379 N.E.2d 235, defines "tortious interference" as follows:

"One who intentionally and *improperly* interferes with [another's business or employment relationship] is subject to liability to the other for pecuniary loss resulting to the other from the [loss of the benefits of the relationship]." (Emphasis added.) 4 Restatement of the Law 2d, Torts (1977) 7, Section 766.

Comment *b* to Section 767 leaves it unclear whether the burden of proving that the defendant acted improperly falls on the plaintiff or whether the burden of proving that the defendant acted properly falls on the defendant. The drafters of the Restatement left that issue to the state courts to untangle.

However, the Supreme Court of Ohio set forth the elements for a claim of tortious interference as follows: "(1) the existence of a[n employment relationship], (2) the wrongdoer's knowledge of the [employment relationship], (3) the wrongdoer's intentional procurement of the [termination of the employment relationship], (4) *lack of justification*, and (5) resulting damages." (Emphasis added.) *Kenty v. Transamerica Premium Ins. Co.* (1995), 72 Ohio St.3d 415, 419, 650 N.E.2d 863, 866. See, also, *Costanzo v. Schubert* (Oct. 18, 1996), Trumbull App. No. 95–T–5274, unreported, at 5, 1996 WL 648926; *Smith v. Klein* (1985), 23 Ohio App.3d 146, 148, 23 OBR 387, 390, 492 N.E.2d 852, 855, citing *West v. Roadway Express, Inc.* (App. 1982), 8 OBR 155, 1982 WL 4975 ("a cause of action

is cognizable for interference with an employment relationship, even absent a contract").

Additionally, the courts of this state have defined a claim for tortious interference as follows:

"One who, *without privilege to do so*, induces or otherwise purposely causes a third person not to perform a contract with another or to enter into or continue a business relation with another is liable to the other for the harm caused thereby." (Emphasis added.) *Juhasz*, 55 Ohio App.2d at 57, 9 O.O.3d at 219, 379 N.E.2d at 238.

"The torts of interference with business relationships and contract rights generally occur when a person, *without privilege to do so*, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." (Emphasis added.) *A & B–Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council* (1995), 73 Ohio St.3d 1, 14, 651 N.E.2d 1283, 1294.

▮ Although several Ohio appellate courts have interpreted privilege and justification as affirmative defenses, *Smith*, 23 Ohio App.3d 146, 23 OBR 387, 492 N.E.2d 852, and *Juhasz*, 55 Ohio App.2d 51, 9 O.O.3d 216, 379 N.E.2d 235, the law in this state imposes the burden of proving *lack of privilege or justification* upon the plaintiff. *Kenty*, 72 Ohio St.3d 415, 650 N.E.2d 863.

▮ In the instant case, the burden of proving justification was erroneously imposed upon appellants. In addition, the jury was not instructed on the issue of privilege by virtue of the fact that appellants filed a complaint with the Ohio Department of Insurance detailing the events that gave rise to this cause of action; specifically, that appellee signed the binding letter without the authority to do so. Upon appellee's uncontested request, the trial court gave an instruction regarding the definition of "justification," however:

"A person acts with legal justification when A, he acts in good faith; B, he has an interest to be upheld; C, the act is limited to the scope of the interest; D, the act is undertaken on a proper occasion and in a proper manner; and, E, the act is directed to the proper parties."

This instruction mimics the instruction for "qualified privilege" given in *Hahn v. Kotten* (1975), 43 Ohio St.2d 237, 244, 72 O.O.2d 134, 138–139, 331 N.E.2d 713, 718–719. Nonetheless, appellants were entitled to a specific instruction regarding the existence of a qualified privilege by virtue of the fact that they filed a complaint with a licensing board, pursuant to *A & B–Abell Elevator Co.*, 73 Ohio St.3d 1, 651 N.E.2d 1283, and *Jacobs v. Frank* (1991), 60 Ohio St.3d 111, 573 N.E.2d 609.

■ The applicability of qualified privilege in tortious interference cases has been recognized by Ohio courts. *Smith v. Ameriflora 1992, Inc.* (1994), 96 Ohio App.3d 179, 187, 644 N.E.2d 1038, 1043; *Smith,* 23 Ohio App.3d at 148, 23 OBR at 389–390, 492 N.E.2d at 855–856; *Donald G. Culp Co. v. Reliable Stores Corp.* (1983), 14 Ohio App.3d 161, 163, 14 OBR 178, 180–181, 470 N.E.2d 193, 196–197; *Juhasz,* 55 Ohio App.2d at 51, 9 O.O.3d at 216, 379 N.E.2d at 235–236; *Pearse v. McDonald's Systems of Ohio, Inc.* (1975), 47 Ohio App.2d 20, 25, 1 O.O.3d 164, 166–167, 351 N.E.2d 788, 791–792. In Ohio, "[p]ublic policy dictates that those who provide information to government officials who may be expected to take action with regard to the qualifications of [insurance representatives] be given a qualified privilege." *A & B–Abell Elevator Co., supra,* at syllabus (dealing with qualifications of bidders for public works contracts). See, also, *Jacobs,* 60 Ohio St.3d 111, 573 N.E.2d 609 (information provided to licensing boards pursuant to R.C. 2305.25 health care boards qualifiedly privileged); *Hahn,* 43 Ohio St.2d 237, 72 O.O.2d 134, 331 N.E.2d 713 (information provided by an insurance company to some of its policy holders regarding the termination and credibility of a former sales representative qualifiedly privileged).

"Although communications to a peer review or licensing board may not be authored and transmitted with impunity, an obvious need exists for candor. The public has a right to feel secure in the knowledge that the professional services it receives are rendered by competent and qualified practitioners. In order to effectively screen applications from prospective practitioners, such boards must be able to receive frank, straightforward appraisals from those in positions to judge the applicants." *Jacobs,* 60 Ohio St.3d at 116, 573 N.E.2d at 614.

■ The qualified privilege relieves a defendant of liability for any report made to a government official acting in an official capacity which may result in an interference with an employment relationship. *Hahn,* 43 Ohio St.2d 237, 72 O.O.2d 134, 331 N.E.2d 713. The qualified privilege may be overcome by a clear and convincing showing of malice, however. *A & B–Abell Elevator Co.,* 73 Ohio St.3d at 11–12, 651 N.E.2d at 1292–1293; *Jacobs, supra,* at paragraph two of the syllabus; *Smith v. Ameriflora 1992, Inc.,* 96 Ohio App.3d at 187, 644 N.E.2d at 1043–1044 (qualified privilege and the requirement that movant show actual malice are the same for tortious interference as those with regard to defamation).

■ Malice, in the context of overcoming a qualified privilege, is defined as acting with a knowledge that the statements made are false or acting with disregard as to their truth or falsity. *A & B–Abell Elevator Co.,* 73 Ohio St.3d at 11–12, 651 N.E.2d at 1292–1293; *Jacobs,* 60 Ohio St.3d at 116, 573 N.E.2d at 614. Malice, in this context, does not require a showing of ill will or hatred for appellee. *Smith v. Ameriflora 1992, Inc.* at 188, 644 N.E.2d at 1043.

"Appellant 'must show sufficient facts to demonstrate the actual malice so that a reasonable jury could find that the actual malice was shown with convincing clarity to defeat (appellee's) assertion of a qualified privilege * * *.' " *Ball v. British Petroleum Oil* (1995), 108 Ohio App.3d 129, 135, 670 N.E.2d 289, 293, quoting *Stresen–Reuter v. Hull* (Aug. 3, 1990), Sandusky App. No. S–89–27, unreported, at 8, 1990 WL 109877.

The jury in this case found that appellants acted with malice toward Doyle. The jury was not instructed and no objections were made that the burden of proof on this issue was clear and convincing evidence, however. Nonetheless, there was sufficient evidence, as stated previously, to show that at the time he filed the complaint with the Ohio Department of Insurance, Hynes *knew* that he had provided incorrect information to appellee and that appellants had no claim to insurance coverage under a State Mutual policy. Consequently, the trial court's erroneous instruction was harmless error, particularly in light of appellants' failure to object or request correct instructions.

Appellants also contend that transmission of truthful information is *absolutely* privileged so that appellants are relieved of liability regardless of any finding by the jury of actual malice on appellants' part, citing *Jacobs, supra,* at paragraph two of the syllabus. Appellants' reliance on *Jacobs* is incorrect to support their theory that truthful information is absolutely privileged. *Jacobs* speaks only to the issue of overcoming a qualified privilege by showing malice in a libel action wherein a graduate of a college of podiatric medicine sued the college based upon statements its director made in a letter to the Virginia State Board of Medicine. Nowhere in the opinion does the Supreme Court of Ohio state unequivocally that truthful information is absolutely privileged. Nor have we found any authoritative case that so states. The courts of Ohio have granted a qualified privilege to individuals who report truthful information to licensing boards.

Accordingly, appellants' sixth assignment of error is without merit.

For their seventh and final assignment of error, appellants maintain that the charge to the jury was erroneous in regard to the issue of emotional distress damages. Appellants miss the mark on this assignment of error by arguing that the standard to be applied to this case is that required to show either intentional or negligent infliction of emotional distress, namely, severe and debilitating emotional distress, citing cases dealing with these causes of action. The emotional distress damages sought in this case, however, are not based on injuries resulting from these two claims. Rather, appellee seeks to recover for the emotional damage he has suffered as a result of appellants' tortious interference and fraud.

The trial court instructed the jury that appellee could recover damages for his emotional distress under either theory of recovery—fraud or tortious interfer-

ence. The court instructed the jury, however, that the standard to be applied was different under each theory.

"If you find the defendants committed a fraud against Matthew Doyle you may go on to consider the damage suffered by the plaintiff as a result of the emotional distress caused by defendants' fraudulent conduct. You may award damages for Matthew Doyle's emotional distress resulting from fraud if you find the defendants' fraudulent conduct was wanton or malicious.

"Conduct is wanton when it is done under such surrounding circumstances and existing conditions that the party doing the act or failing to act must be aware from his knowledge of such circumstances and conditions that his conduct will probably result in injury.

"Wanton conduct implies a failure to use any care for the plaintiff and an indifference to the consequences when the probability that harm would result from such failure is great and such probability is known or ought to have been known to the defendants.

"Someone acts maliciously when they act with either A, the state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge or B, a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.

"If you find the defendants' fraudulent conduct was wanton or malicious, then you will also award damages for any shame, humiliation and/or mental suffering endured by Matthew Doyle.

" * * * If you find the acts of the defendants' interference with Matthew Doyle's employment relations have caused plaintiff to suffer emotional distress and that a reasonable person would expect the emotional distress to result from the interference, then you will also award damages to plaintiff for the distress which you find he has suffered whether or not defendants' conduct was wanton or malicious."

 Traditionally, a party is entitled to the damages that have been proximately caused by the wrongdoing of the tortfeasor. *Burr*, 23 Ohio St.3d at 74, 23 OBR at 204–205, 491 N.E.2d at 1106. Ohio courts have recognized the need to compensate plaintiffs for emotional distress that accompanies other, more tangible damages such as lost income or physical injury.

"In an action for intentional and wilful wrongful act, humiliation, injury to feelings and mental suffering, naturally and necessarily resulting from the wrongful act, may be considered by the jury in their estimate of compensatory damages." *M.J. Rose Co. v. Lowery* (1929), 33 Ohio App. 488, 493, 169 N.E. 716, 718, citing *Smith v. Pittsburgh, Ft. Wayne & C. R.W. Co.* (1872), 23 Ohio St. 10.

"In the absence of a contemporaneous physical injury, damages attributable to mental distress are usually recoverable only if the wrongdoer's act is a malicious or outrageous invasion of a personal right." *Columbus Fin., Inc. v. Howard* (1975), 42 Ohio St.2d 178, 185, 71 O.O.2d 174, 178, 327 N.E.2d 654, 658.

When a claim of fraud is at issue, the jury must find that the defendant acted with malice or with wanton disregard for others in order to award damages for emotional suffering. See *Smith v. Natl. Home Life Assur. Co.* (Aug. 31, 1983), Clermont App. No. CA 1168, 1983 WL 4462. Malice has been defined as "hatred, ill-will or a spirit of revenge" at common law, *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174, syllabus, or "acting with knowledge that the statements are false or acting with reckless disregard as to their truth or falsity" in the context of overcoming a qualified privilege, *A & B–Abell Elevator Co.*, 73 Ohio St.3d at 11–12, 651 N.E.2d at 1292. Malice, in this context, need only be proven by a preponderance of the evidence because no First Amendment right is at stake as in the case of a privileged communication. Further, R.C. 2315.21(C)(3) provides that malice must be proven by clear and convincing evidence when seeking *punitive* damages. In this instance, appellee was only seeking *compensatory* damages, so the standard of clear and convincing evidence is inapplicable.

Wanton disregard is defined as "the failure to exercise any care whatsoever." *Fabrey v. McDonald Village Police Dept.* (1994), 70 Ohio St.3d 351, 356, 639 N.E.2d 31, 35, citing *Roszman v. Sammett* (1971), 26 Ohio St.2d 94, 96–97, 55 O.O.2d 165, 166–167, 269 N.E.2d 420, 422–423. The issue of wanton conduct is normally left to the jury. *Fabrey*, 70 Ohio St.3d at 356, 639 N.E.2d at 35–36.

In the case of tortious interference, malice need not be proven, because the interference is, if proven, an invasion of a fundamental personal right—the right to obtain and retain gainful employment. See *Columbus Fin., Inc.*, 42 Ohio St.2d 178, 71 O.O.2d 174, 327 N.E.2d 654.

The trial court's instructions regarding emotional distress in this case are substantially correct. Further, appellants did not object to these jury instructions before the jury retired to consider its verdict. Nor did appellants raise an objection in their appellate brief that the jury's finding of malice was erroneous. Since appellants have failed to make an affirmative showing of plain error, we find appellants' seventh assignment of error without merit.

Appellants also contend that appellee may not recover damages for emotional distress without expert testimony to establish the extent of the mental distress suffered. We disagree. Although expert testimony can assist the trier of fact in determining the severity of the distress, lay witnesses who are closely acquainted with the injured party are completely competent to testify to this type

of damage. *Paugh v. Hanks* (1983), 6 Ohio St.3d 72, 80, 6 OBR 114, 121, 451 N.E.2d 759, 766–767 (a case brought under a claim of negligent infliction of emotional distress). These lay witnesses may testify to substantial changes in appellee's "emotional or habitual makeup" that they personally observe. *Id.* Further, the jurors may rely upon their own personal experiences in determining the severity of appellee's emotional distress. *Id.*

In this case, appellee presented the testimony of his wife and himself to address the issue of his mental distress damages. Whether this testimony was credible was a question in the proper province of the jury. Moreover, the jury was permitted to call upon its own experiences in rendering a decision regarding appellee's emotional distress. Accordingly, appellee was entitled to rely exclusively on lay witness testimony to prove his damages for emotional distress, and appellants' contention that expert testimony was necessary is without merit.

We note that with our affirmance of the jury's verdict in appellee's favor comes an award of $1.4 million. As compensation for appellants' tortious conduct, the jury found that appellee was entitled to $750,000 for lost wages and $650,000 for the attendant emotional distress. Although the jury's award of $750,000 for lost wages falls within the range suggested by appellee's expert witness, we are troubled by the generosity of the jury's award of $650,000 for emotional distress damages. Although we are permitted to order a remittitur of excessive damage awards with the consent of appellee as a condition for affirming the jury's verdict, we decline to do so, as appellants failed to make this request at the trial level and in their brief before this court. *Bartlebaugh v. Pennsylvania R. Co.* (1948), 150 Ohio St. 387, 38 O.O. 237, 82 N.E.2d 853; *Fromson & Davis Co. v. Reider* (1934), 127 Ohio St. 564, 189 N.E. 851; *Chester Park Co. v. Schulte* (1929), 120 Ohio St. 273, 166 N.E. 186; *Alter v. Shearwood* (1926), 114 Ohio St. 560, 151 N.E. 667; *Silverglade v. Von Rohr* (1923), 107 Ohio St. 75, 140 N.E. 669; *Pendleton Street RR. Co. v. Rahmann* (1872), 22 Ohio St. 446; *Christophel v. McNeill* (Dec. 24, 1980), Highland App. No. 375, unreported; *Donovan v. Manning* (Nov. 13, 1980), Cuyahoga App. No. 41692, unreported, citing *Chester Park Co., supra.* See, also, 5 Ohio Jurisprudence 3d (1978, Supp.1996) 375–378, Appellate Review, Section 691.

Appellee, for his only assignment of error on cross-appeal, alleges that the trial court erred in refusing to grant his motion for prejudgment interest pursuant to former R.C. 1343.03(C), which provided:

"Interest on a judgment, decree, or order for the payment of money rendered in a civil action based on tortious conduct and not settled by agreement of the parties, shall be computed from the date the cause of action accrued to the date on which the money is paid, if, upon motion of any party to the action, the court

determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case." 139 Ohio Laws, Part I, 2034, 2035.

The party seeking prejudgment interest bears the burden of showing that the other party failed to make a good faith effort to settle the case. *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638, 659, 635 N.E.2d 331, 348. The trial court is granted broad discretion in rendering a decision on this matter. *Huffman v. Hair Surgeon, Inc.* (1985), 19 Ohio St.3d 83, 87, 19 OBR 123, 126–127, 482 N.E.2d 1248, 1251–1252. Accordingly, a reviewing court is limited to determining whether the trial court abused the discretion it has been granted. *Mobberly v. Hendricks* (1994), 98 Ohio App.3d 839, 845, 649 N.E.2d 1247, 1250–1251. A judgment awarding or denying a party's motion for prejudgment interest will not be reversed absent an affirmative showing that the underlying decision is not supported by some competent, credible evidence. See *Smith v. Jaskowiak* (May 17, 1991), Trumbull App. No. 90–T–4365, unreported, 1991 WL 84230.

The Supreme Court of Ohio has set forth factors to which a trial court and reviewing court must look to determine whether prejudgment interest should be granted: did the party (1) fully cooperate with discovery, (2) rationally evaluate risks and potential liability, (3) not attempt to delay the proceedings unnecessarily, and (4) make a good faith monetary settlement offer or respond in good faith to an offer from the other party? *Kalain v. Smith* (1986), 25 Ohio St.3d 157, 25 OBR 201, 495 N.E.2d 572, syllabus. See, also, *Loder v. Burger* (1996), 113 Ohio App.3d 669, 681 N.E.2d 1357. If a party has a good faith, objectively reasonable belief that he has no liability, he need not make a monetary settlement offer. *Kalain, supra,* at the syllabus.

In the instant case, the evidence shows that appellee made a settlement demand of $250,000 early in the case, which appellants did not specifically reject. Appellants did, however, state in a pretrial conference that they were ready to try the case and would consider making a settlement offer only if appellees would reduce their demand to fall within the range of $20,000 to $25,000. Based on the foregoing analysis of the difficult issues in this case, appellants had a good faith, objectively reasonable belief that they had no liability in this case such that they did not act improperly in failing to negotiate a settlement. Appellants appear to have rationally evaluated their risks in this case as well, even though they were ultimately unsuccessful. Poor predictive ability does not necessarily establish lack of good faith. *Loder, supra,* 113 Ohio App.3d at 675, 681 N.E.2d at 1362. Further, appellants complied with all discovery requests, and did not unnecessarily delay the trial of this case. Therefore, the trial court did not abuse its

discretion in denying appellee's motion for prejudgment interest. Appellee's assignment of error on cross-appeal is meritless.

The judgment of the trial court is affirmed.

*Judgment affirmed.*

FORD, P.J., concurs with concurring opinion.

CHRISTLEY, J., concurs.

FORD, Presiding Judge, concurring.

Although I concur in the judgment, and most of the analysis set forth in the majority opinion, I believe that the portion of the opinion concerning the agent's unauthorized signature as an intervening cause is unnecessary in the context of the intentional misrepresentation claim at issue in the case.

As a general rule, intervening causation is typically raised in the context of a negligent tort and has limited application in the intentional tort setting. The Supreme Court of Ohio has stated that if an intentional tort was committed with malice, and if that intentional tort was the proximate cause of the plaintiff's damage, then the negligence of the plaintiff is not a defense. *Schellhouse v. Norfolk & W. Ry. Co.* (1991), 61 Ohio St.3d 520, 524, 575 N.E.2d 453, 456. The court further held that actions committed with intent "constitute behavior qualitatively different from that which may be characterized as merely negligent." *Id.*

Intentional acts, by their very nature, presuppose the occurrence of the results they bring about, *i.e.*, the ultimate injury is basically inevitable. See *Harasyn v. Normandy Metals, Inc.* (1990), 49 Ohio St.3d 173, 175, 551 N.E.2d 962, 964–965, quoting 1 Restatement of the Law 2d, Torts (1965) 15, Section 8A; *Rose v. Clark Oil & Refining Corp.* (June 10, 1991), Butler App. No. CA90-07-139, unreported, at 3, 1991 WL 99500. Consequently, the occurrence of an intervening act by the plaintiff is usually irrelevant because it does not cut off the liability of the actor who originally committed the intentional tort. See *Schellhouse*, 61 Ohio St.3d at 524, 525, 575 N.E.2d at 456, 456–457. Thus, generally an intervening act is not a defense to an intentional tort. Foreseeability, however, is inherently part of the proximate cause analysis, and I do not take issue with that portion of the majority's analysis.

Regarding the evidential issue, I am of the opinion that the New York Life application was admissible to show conduct consistent with a scheme and/or plan to defraud. Again, in my opinion, the analysis concerning Evid.R. 403 is not applicable to the facts in this case.