**In re IMMOBILAIRE, IV, LTD., Debtor.**

**Alan Tinnes, et al., Plaintiffs,**

v.

**Immobilaire IV, Ltd., et al., Defendants/Third Party Plaintiffs,**

v.

**Christy S. Jerles Kaster, et al., Third Party Defendants.**

**Bankruptcy No. 01–55960.
Adversary No. 01–2266.**

United States Bankruptcy Court, S.D. Ohio, Eastern Division.

Aug. 5, 2004.

142

John F. Berry, Portsmouth, OH, Sean A. McCarter, Columbus, OH, for Defendants.

Robert E. Bardwell, Jr., Columbus, OH, for Debtor.

William B. Logan, Jr., Luper Neidenthal & Logan, Columbus, OH, for MELAF.

Jeffrey C. Pettys, Benjamin S. Zacks, Zacks Law Group LLC, Columbus, OH, for Plaintiffs.

Alexander G. Barkan, Assistant U.S. Trustee, Columbus, OH.

Andrew M. Malek, Office of U.S. Attorney, Columbus, OH, for I.R.S.

## MEMORANDUM OPINION AND ORDER

CHARLES M. CALDWELL,
Bankruptcy Judge.

This Memorandum Opinion and Order constitute the Court's findings of fact and conclusions of law regarding the Second Amended Third–Party Complaint for Declaratory Judgment ("Complaint"). It was filed on behalf of Immobilaire IV, Ltd., David L. Davis, Michael A. Davis and Imobilaire III, Inc. ("Plaintiffs"). The Plaintiffs seek a judgement against Ms. Christy S. Jerles Kaster ("Mrs. Jerles") and the Estate of Robert L. Jerles ("Defendants"). The dispute is based upon the sale of real estate formerly owned by the Defendants that is located at 6150 Sunbury Road, Westerville, Ohio ("Sunbury property").

The Sunbury property is composed of approximately 3.73 acres that has been improved by the construction of a restaurant and sports bar that includes approximately eight thousand square feet. The restaurant was known as the Scoreboard Lounge ("Scoreboard"), and was formerly operated by a Mr. Bruce Burns ("Mr. Burns"). Also, there is a separate wine and cheese shop that includes approximately two thousand, eight hundred square feet. It was known as the Wine and Cheese Emporium ("Emporium"), and it was formerly operated by a Mr. C. William Roessler ("Mr. Roessler") through his company known as Westerville Beverage, Inc. ("Westerville Beverage").

The Plaintiffs assert that they are entitled to a judgment based upon fraud, deceit, conspiracy and tortious damage to credit. The Plaintiffs seek compensatory damages in the amount of $7,500,000.00, in addition to punitive damages, attorney fees, costs and pre and post judgment interest. Based upon a review of evidence

the Court has concluded that the Plaintiffs have failed to sustain their burden of proof, and that judgment must be rendered in favor of the Defendants.

The dispute involves several parties, their counsel, and three related lease and purchase transactions. Also, there was prior litigation before the Franklin County Court of Common Pleas, the Tenth District Court of Appeals of Ohio, and the Ohio Supreme Court. Based upon the filing of a chapter 11 petition, the litigation was removed to this Court. The Court will separately discuss the three transactions.

### The Lease with Option to Purchase Between Imobilaire III, Inc. and Mrs. Jerles

Michael A. Davis ("Dr. Davis") has been a Chiropractic Physician in the Columbus area since 1982, owning two locations, and his brother David L. Davis ("Mr. Davis") has been a police officer, and a congressional aide and candidate in Daytona Florida. Mr. Davis moved to Columbus on January 9, 1992, to go into the restaurant business with Dr. Davis. A restaurant business located at 480 E. Wilson Bridge Road, Worthington, Ohio was purchased by Dr. Davis for the sum of $325,000.00.

In 1994, it was remodeled at the expense of approximately $350,000.00 to $475,000.00, and it was changed to a sports theme. It became known as the Rush Creek Sports Bar and Grille ("Rush Creek I"), and it was operated through Imobilaire, Inc., ("Imobilaire"). Imobilaire was owned 95% by Dr. Davis and 5% by Mr. Davis. Dr. Davis was the President, and Mr. Davis was the Secretary/Treasurer. According to the testimony of Mr. Davis, who served as the manager, the annual sales of this restaurant grew from approximately $500,000 to more than $1,000,000.00.

Based upon these results, the idea of a second location arose. The Sunbury property was identified. Through a family friend, a Mr. Tony Disabato, Mr. Davis contacted Mr. Robert L. Jerles ("Mr. Jerles") regarding the Sunbury property. He is the deceased husband of Mrs. Jerles. Their discussions began in February 1996, and at that time the Scoreboard was being operated by Mr. Burns. He was on a month-to-month lease with Mrs. Jerles, and had sales of approximately $1,300,000.00 during his best year of operations, 1993.

According to the testimony of Mr. Davis, the Plaintiffs' interest in the Sunbury property was not only the Scoreboard but also the Emporium. Mr. Davis testified that from the beginning his plan was to buy the Sunbury property, and then evict all of the tenants. The Plaintiffs envisioned having one of their employees from Rush Creek I manage the Emporium, and to economize they planned to utilize the Scoreboard's food preparation facilities. The Plaintiffs also testified that one of the biggest draws was the potential addition of a drive through, since Westerville was dry at the time. Dr. Davis also wanted to sell cigars from the Emporium, and he testified that he told his brother to make sure they also obtained the Emporium.

Mr. Davis testified that he shared these overall plans with Mr. Jerles during their third phone conversation. Mr. Davis testified that Mr. Jerles represented to him in their initial discussions that Westerville Beverage was in default, and that it could be evicted. Mr. Jerles also gave him a copy of the lease, that according to Mr. Jerles, provided that the failure to act on defaults did not constitute a waiver. A Mr. Shannon Keg ("Mr. Keg"), an employee of Mr. Davis, confirmed that Mr. Jerles represented that the Westerville Beverage lease was in default.

Dr. Davis testified that he never talked directly to Mr. Jerles, but was present in the room during phone conversations between Messrs. Davis and Jerles. Specifically, Dr. Davis recalled that he was present in the room when Mr. Davis questioned Mr. Jerles over the telephone regarding the status of the Westerville Beverage lease, and through his brother he even encouraged Mr. Jerles to give Westerville Beverage additional time to cure the defaults.

There was a series of phone conversations between Messrs. Davis and Jerles that resulted in the faxing of a number of written lease and purchase proposals. The proposals prompted further phone conversations. It is significant to note that the proposals were faxed to Mr. Jerles not Mrs. Jerles, who were both residing in South Carolina. The proposals emphasize the continuing deterioration of the Scoreboard, and that Messrs. Jerles and Davis were trying to find some way to structure a transaction that would relieve the Defendants of the responsibility for the management of the Sunbury property from South Carolina. It is also apparent that Mr. Davis was extremely interested in the Sunbury property, and he had done some research regarding its condition and future prospects. Finally, in the written proposals reviewed by the Court the focus is upon the purchase of the Sunbury property or the leasing of just the Scoreboard portion. Contrary to the stated intent to evict the Emporium tenant, the written proposals reviewed by the Court did not contain a discussion of any present or future plans to operate the Emporium.

After all of these communications, Mr. Jerles decided that a lease arrangement for the Scoreboard portion, rather than a sale of the Sunbury property, was the preferable route. According to Mr. Davis, Mr. Jerles expressed that he wanted to first see if the Plaintiffs could successfully run the Scoreboard portion before selling. Subsequently, a lease effective May 1, 1996, was executed by Mrs. Jerles as the landlord and Mr. Davis on behalf of Imobilaire III, Inc. ("Imobilaire III"). Mr. Davis is the President of Imobilaire III, and is its sole shareholder. Mr. Keg was the Secretary.

The lease included that portion of the Sunbury property previously occupied by the Scoreboard, and it expressly excluded the Emporium. It was a six-year lease set to expire on April 30, 2002, and it required monthly rent based upon between 5 and 12 percent of annual gross sales ranging from $1,000,000.00 to more than $1,500,000.00. According to the testimony of Mr. Davis the lease was structured with no base rent or performance clause for the protection of the Plaintiffs in the event the purchase option was exercised, and they were unable to evict the Emporium tenant.

The lease also included an option for two additional six-year terms. Because of the shared utilities with the Emporium, the lease contained a provision that provided for reimbursement to the Plaintiffs for the Emporium's share of the utilities. Most significantly, the lease also contained an option to purchase for the sum of $2,095,000.00, and it had to be exercised by no later than April 30, 1998. If the option was exercised and the property was sold again within two years, Mrs. Jerles, was entitled to 100 percent of the proceeds over the original purchase price.

Upon obtaining possession of the Scoreboard, Mr. Davis discovered that it had been severely damaged, including the removal of electrical fixtures, and kitchen equipment. The damage was allegedly caused by the former tenant. When Mr. Davis communicated this problem to Mr. Jerles, the Plaintiffs were offered an opportunity to void the lease. On May 9,

1996, Mr. Davis faxed a letter to decline the offer, again to Mr. Jerles rather than Mrs. Jerles, in South Carolina. Also, in this letter Mr. Davis makes representations that appear inconsistent with the stated intent to evict the Emporium tenant. Mr. Davis stated in relevant part as follows:

Bob, it is my position that our deal is good and I stand firm in proceeding forward. This letter will serve as an acceptance of all areas included within our lease agreement and I hold you harmless for those things that have occurred with respect to the conditions that were left behind ... *Additionally, I have made several contacts with the carry out (Emporium) tenants and have assured them of our cooperation in working with them to a(sic) mutual beneficial ends. Already, we are looking at plans to combine some of our parallel needs and have offered our services to them as good neighbors should. In your conversations with them, you will find that we are addressing their needs where they are similar to ours ... Our next step, after opening, will be in developing a financial plan for purchasing the site.* (emphasis supplied).

In view of the damage to the property, the renovation plans and budget were drastically altered. Rather than opening in four weeks as originally planned, the restaurant was not opened until November 1, 1996. Most significantly, rather than spending the projected amount of $250,000.00 for renovations, the sum of approximately $700,000.00 was expended, in addition to sweat equity. Approximately $300,000.00 of the funds came from Dr. Davis who was only repaid the sum of approximately $110,000.00.

Mr. Davis testified that on May 1, 1996, he met Mr. Roessler, but that there was no communication regarding any possible purchase of the Sunbury property, or any plans to evict. Mr. Davis testified that he did not meet Mr. Jerles in person until after the lease was signed, and this meeting took place around August 1996. At that time Mr. Davis testified that they walked around the Sunbury property, and he again discussed his overall plan, including the eviction of Westerville Beverage. During this meeting, Mr. Jerles expressed concern with the amount of money being expended for renovations.

On November 1, 1996, approximately six months after the effective date of the lease, the second restaurant finally opened, and it was called Rush Creek Sports Bar and Grille, II ("Rush Creek II"). During the first month of operations it generated significant gross sales. Unfortunately, under the terms of the lease, the rental charge was too high. In fact, Rush Creek II experienced cash flow problems from the beginning, according to Mr. Davis. For example, on December 12, 1996, Mr. Davis corresponded with Mr. Jerles to convey the November 1996 gross sales figure of $211,471.00 and transmit the rent in four separate checks that totaled $25,376.52. The letter was closed with the following statement:

Bob, I appreciate your willingness to delay depositing these checks over a period of time. *I am still behind about $90,000.00 in construction and supply costs which I am trying to pay down.* Your understanding in this situation will make it easier for me to get these debts paid down. (emphasis supplied).

According to the testimony of Mr. Davis payroll taxes were not paid for Imobilaire III for the years of 1996 and 1997. Ultimately, a federal tax lien was filed. Also, a mechanic's lien was filed against the Sunbury property by the Electric Connection, Inc. for unpaid electrical work in the amount of $56,920.00. Correspondence be-

tween Messrs. Davis and Jerles indicates that the sales of Rush Creek II declined after the opening month, and that the rental payments were not timely. The gross sales were as follows: December 1996 $145,608.00; January 1997 $133,332.13; February 1997 $109,803.89; March 1997 $141,390.95, and April 1997 $117,285.20. In March 1997, even with significant financial problems only months after opening, the sum of $114,000.00 was taken out of Rush Creek II for Dr. Davis to pay his taxes.

### Sale of the Emporium and the Lease Assignment Between Westerville Beverage and W and C, Inc. (Mr. Tinnes)

As discussed above, the Sunbury property was occupied by two businesses-the Scoreboard and the Emporium. The Emporium was the subject of a lease between Mrs. Jerles and Westerville Beverage effective October 8, 1992, and ending on October 7, 1997. The lease was renewable for another ten years. The rent was $49,200.00 per year payable in monthly installments of $4,100.00, plus 20 percent of the utilities, taxes and assessments.

Mr. Allen Tinnes ("Mr. Tinnes") had been a wine distributor to the Emporium. In October 1996, he heard that Mr. Roessler was having difficulty with the operation of the Emporium. Mr. Tinnes also knew that the inventory of the Emporium was low, and that sales had declined from approximately $1,000,000.00 to $850,000.00 per year. Mr. Tinnes also testified that he had been interested in buying the Sunbury property, but that Mr. Jerles told him no because of discussions with Mr. Davis. On December 26, 1996, approximately eight months after the execution of the lease with an option to purchase between Mrs. Jerles and Immobilaire III and approximately two months after the opening of

Rush Creek II, three documents were signed with reference to the ownership of the Emporium and the underlying lease.

First, on December 26, 1996, a hand-printed letter addressed to Mr. Tinnes was issued on the stationary of Mr. Jerles, but was signed by Mrs. Jerles, as the landlord. Mr. Tinnes testified that this letter was given to him by Mr. Jerles on December 26, 1996. Mrs. Jerles testified that she only has a vague recollection of this document. The letter provided as follows:

It is my understanding that you are taking over the lease obligations of Westerville Beverage, Inc. to the Landlord of the above referenced business. (Lease dated October 8, 1992) *You should be aware that Section 4(a), in regard to real property taxes and assessments has been waived. All other terms are in force.*

*I am willing to negotiate a new lease at any time to an entity that has the financial ability to handle the obligation.* Whatever is the initial term, I will allow two options of equal term.

*Until a new lease is executed, both yourself and Westerville Beverage, Inc. are responsible for the present lease.* (emphasis supplied).

Second, on December 27, 1996, an Asset Purchase Agreement was executed between Westerville Beverage, Inc. and W and C, Inc. for the sale of the Emporium. The price was the balance due on a promissory note in the amount of $225,000.00 plus an amount for inventory and supplies, and $5,000.00 for the liquor license. The promissory note was between Mr. Roessler and Mr. Jerles and other individuals and entities that had been involved in the start of the Emporium. The contract was singed by Mr. Roessler on behalf of Westerville Beverage and Mr. Tinnes on behalf of W and C, Inc.

The sale of the Emporium was scheduled to close on January 2, 1997, and at the closing Mr. Tinnes was required to assume the lease and obtain a release of liability for Mr. Roessler. On January 2, 1997, an Assumption and Indemnification Agreement was executed by Mr. Tinnes and Mr. Roessler because a release had not been obtained under the note and the lease. In this Agreement Mr. Tinnes was given until January 31, 1997, to obtain the releases. It further provided:

> Alan Tinnes, individually, and W & C, Inc., hereby assume any and all obligations with regard to the Lease and W & C, Inc., and Alan Tinnes hereby hold Westerville Beverage, Inc. and C. William Roessler harmless and indemnify them against any and all loss, claims, liability costs or damages with regard to the Note and the Lease which Alan Tinnes and W & C, Inc. hereby unconditionally assume and guarantee payment of the Lease and the Note.

Third, on January 14, 1997, Mr. And Mrs. Jerles, signed an Application for Transfer of Ownership to allow for the transfer of the liquor license to Mr. Tinnes. Mrs. Jerles testified that she did not understand the significance of this document. Starting in February 1997, however, rental payment checks signed by Mr. Tinnes in the amount of $4,100.00 each month were issued to Mrs. Jerles, and they appear to have been deposited on her behalf.

During the first week of January 1997, Mr. Davis for the first time met Mr. Tinnes, who he assumed simply was someone working at the Emporium. Two days later, however, he met Mr. Tinnes again, and Mr. Tinnes introduced himself as the manager. Also, Mr. Keg testified that he first became aware of Mr. Tinnes in January 1997. Dr. Davis testified that he ate sandwiches at the Emporium, and noticed that there was someone new there that he knew by the name of "Allen". According to his testimony, however, he never talked to Mr. Tinnes.

According to Mr. Tinnes after he purchased the Emporium, he was present every day, and that sometime in December 1996, he had a meeting with Mr. Jerles who then took him over to meet Mr. Davis. Mr. Tinnes ultimately disclosed to Mr. Davis that he was operating the Emporium based upon a purchase-related management agreement. Mr. Tinnes even told Mr. Davis that he had talked to Mr. Jerles about the purchase. Mr. Davis testified that this information prompted him to call Mr. Jerles in January 1997, and Mr. Jerles responded that he knew nothing about Mr. Tinnes. According to Mr. Tinnes, he also began to pay the Emporium's share of the utilities to Mr. Davis by check written on Mr. Tinnes' corporate account.

Mr. Davis testified that he talked to Mr. Tinnes on various occasions after it became obvious that Mr. Davis was going to buy the Sunbury property. Mr. Davis testified that Mr. Tinnes even expressed that he anticipated being offered a new lease. Mr. Tinnes in his testimony confirmed that he expressed an interest in a new lease to Mr. Davis, but was told to wait until after the closing. Mr. Davis also testified that he did not tell Mr. Tinnes of any eviction plans. Mr. Davis testified that he had another conversation with Mr. Jerles, who explained that any attempted assignment would simply be another violation of the Westerville Beverage lease. Mr. Davis testified, however, that he never talked to Mr. Roessler to confirm the status of the lease.

Mr. Davis testified that he was not aware of any of the transactions between the Defendants and Messrs. Tinnes and Roessler, and the December 26, 1996, letter until after he closed on sale of the

Sunbury property. Mr. Keg confirmed in his testimony that Mr. Davis did not learn that Mr. Tinnes was more than a manger until after the closing. It is this alleged lack of knowledge and the relationship to the purchase transaction for the Sunbury property that is at the heart of the dispute between the parties. The Plaintiffs maintain that had they know of these arrangements between the Jerles, and Messrs. Roessler and Tinnes, they would not have been interested in the Sunbury property, because the economic viability of the project depended upon income from the Emporium. Instead, the Plaintiffs assert that the Defendants fraudulently attempted to waive the defaults under the lease and approve the assignment of the lease to Mr. Tinnes.

### Sale of the Sunbury Property Between the Defendants and Immobilaire IV, Ltd.

As discussed above, Mr. Davis opened Rush Creek II on November 1, 1996. Approximately one month later, during the first week of December 1996, Mr. Davis exercised the purchase option. At this time according to the testimony of Mr. Davis, Mr. Roessler was still occupying the Emporium space. Mr. Davis anticipated that the closing would take place in late January or early February 1997 at the latest.

At the suggestion of Mr. Jerles, Mr. Davis pursued financing from National City Bank ("National City") that held the mortgage on the Sunbury Property. The loan officer primarily involved was a Mr. James R. Partridge ("Mr. Partridge"). Mr. Partridge testified that his sole contact prior to closing was with Mr. Davis. On January 7, 1997, Mr. Davis corresponded with Mr. Partridge to describe the business operations and results, and to explain why the purchase of the Sunbury property

made sense, rather than continuing to lease. In relevant part, he represented that, "... the attractiveness of purchase has many reasons, *not to mention, the additional revenue of $50,000.00 annually generated by the retail space leased to the Wine and Cheese carry out. (Emporium)*." (emphasis supplied). Significantly, this correspondence appears inconsistent with the stated intent of the Plaintiffs to evict the Emporium tenant.

On March 10, 1997, Mr. Partridge submitted an internal memorandum that recommended approval of the loan. The memorandum was based upon information supplied by Mr. Davis, and it is at variance with the stated intent to evict the Emporium tenant. In the "Property Description" portion of the memorandum it is stated: " As an update, a new operator has taken over the Wine & Cheese Emporium and is doing very well according to Mr. Davis ..." In the "Economics" section of the memorandum, Mr. Partridge factored annual rental income of $49,200.00 from the Emporium. In the "Transaction Analysis" portion of the memorandum it is stated:

This deal makes sense for the principals of Rush Creek due to the structure of the lease with Bob Jerles ... Rush Creek will pay Mr. Jerles 9% of sales if sales are $1.5 MM or above. Based on the sales to date of Rush Creek, Mr. Davis estimates that the restaurant will have annual sales in the $2.6MM to $3.1MM range. This equates to annual rent payments of between $234M ($23.40/s.f.) and $279M ($27.90/s.f.). *Obviously these rents are very high when compared to market rents of approximately $15/s.f. The above scenario puts the owners of Rush Creek in a unique position in that owning the subject property is significantly more advantageous than leasing, assuming that sales remain near current projected levels. The Wine and Cheese shop's lease pay-*

*ments would help offset any debt service under an ownership structure rather than just paying lease payments.* (emphasis supplied).

According to Mr. Davis, having control over the Emporium operations was essential to make the project cash flow. He, however, never shared this plan or the idea of constructing a drive through with Mr. Partridge during the loan negotiations or at any other time prior to the closing. According to the testimony of Mr. Davis he did not share the full scope of his plans with National City on the advice of his accountant, a Mr. Stanley R. Nartker. As Mr. Davis explained, he was told that such plans were too speculative for purposes of obtaining a loan, even though obtaining the Emporium was material to make the project cash flow. Also, Mr. Davis testified that no written financial projections were ever prepared for the operation of the Emporium or a drive through to be constructed. All of these facts appear inconsistent with the assertion that the Plaintiffs planned to evict the Emporium tenant, rather than continuing to receive significant rental income to help pay their mortgage obligations to National City and the Defendants.

It was at this point that Mr. Davis switched counsel, due to the fact that the Defendants were also represented by the law firm of Squire, Sanders & Dempsey, LLP ("Squire"). This prompted Mr. Davis to seek a recommendation for alternative counsel, and he was referred to a Mr. Frank J. Agin ("Mr. Agin"). Mr. Agin testified that he had been involved in only one other commercial real estate closing before, and he had never pursued a commercial eviction based upon an alleged improper assignment.

Mr. Agin began his representation of the Plaintiffs after National City issued its commitment letter on March 11, 1997.

The letter specified that it was subject to personal guarantees from Mr. and Dr. Davis, and that it would be subject to a first mortgage on the Sunbury property and an assignment of rents. Also, the letter specified that any second mortgage to be held by the Defendants could not have any foreclosure privileges. Finally, in the letter National City required Mr. Davis to provide National City tenant estoppel certificates as follows:

> *Borrower shall furnish Lender tenant estoppel certificates, in (a) form acceptable to Lender, executed by all tenants as Lender may require, certifying that the tenant's lease is in full force and effect without modification,* that the tenant is paying rent on a current basis, and that there exists no prepayment or right of setoff ... (emphasis supplied).

On April 7, 1997, Mr. Agin wrote a letter that was addressed to Mrs. Jerles but in care of her counsel at Squire, a Ms. Alice Blankenship ("Ms. Blankenship"). The purpose of this correspondence was to formally exercise the purchase option. Immobilaire IV Ltd. ("Immobilaire IV") was formed to make the purchase, and it was owned 50% by Dr. Davis and 50% by Mr. Davis. Mr. Davis served as the managing partner.

Mr. Davis testified that after the exercise of the option there was a phone conference between himself, Mr. Agin, Ms. Blankenship and Mr. Jerles. Mr. Davis testified that during the phone conference it was represented by Mr. Jerles that Westerville Beverage was the tenant of the Emporium, that it was in default, and that it could be evicted. While Mr. Agin never talked directly to Mr. Jerles, he confirmed that he was involved in this phone conference with Mr. Jerles, and he confirmed the representations regarding the Westerville Beverage lease. Mr. Davis also testified that around the same time the phone con-

ference was conducted, he told Mr. Agin to make sure he was protected, including any affidavits to confirm that what had been represented by Mr. Jerles regarding the Emporium was true. In addition, Dr. Davis testified that at some point he specifically instructed Mr. Agin to ensure that they obtained the Emporium. The Plaintiffs, however, never instructed Mr. Agin to evict the Emporium tenant prior to the closing.

Mr. Agin also recalls that during this phone conference there was no mention of Mr. Tinnes. Further, Mr. Agin testified that at some point Ms. Blankenship confirmed to him that Westerville Beverage was the tenant of the Emporium, and that it was in default under its lease. Mr. Agin testified that Ms. Blankenship never stated that there was another tenant, and that she never told him about the sale of the Emporium or the attempt to assign the lease. The Court, however, was not provided with any testimony from Ms. Blankenship.

On April 29, 1997, Ms. Blankenship wrote a letter to Mr. Davis in care of Mr. Agin to express several key terms of the transaction. The terms reflect the declining sales and financial health of Rush Creek II only a few months after opening. The letter provided in relevant part as follows:

> Buyer will pay Seller's legal fees ... in an amount not to exceed $5,000 ... The sale price for the property is $2,095,000 ... Buyer will obtain a mortgage loan from National City Bank ... in the amount of $1,050,000 ... The balance of the purchase price will be financed by Seller and evidenced by a promissory note ... in the amount of $1,045,000 ... *Seller agrees that it will loan Buyer funds to pay the customary closing costs on the National City loan and removal of the mechanic's lien of*

> *The Electric Company against the property in a total aggregate amount not to exceed $40,000, plus the Legal Fees.* The sums advanced with regard to the closing costs, Legal Fees and satisfaction of the mechanic's lien shall be evidenced by a promissory note ... Payment of the (promissory notes) will be guaranteed by David Davis and Dr. Michael Davis ... (and) will contain cognovit provisions. The (promissory notes) shall be secured by a second mortgage on the property and by a first security interest in all membership interests ... In the event that the Property is resold within two ... years ... Buyer agrees to provide Seller with 100% of the amount of the selling price over the amount of $2,095,000. *The closing statement will not reflect any prorated taxes to be paid by Seller as Seller has paid real estate taxes on the premises during the Lease term although the Lease provided that payment was the obligation of (Imobilaire) III* ... (emphasis supplied).

With reference to the leasehold interests involved, Ms. Blankenship's April 29, 1997, correspondence required that the Plaintiffs assume all of Mrs. Jerles' obligations under the leases with Westerville Beverage and Imobilaire III. On April 29, 1997, Mr. Davis signed and agreed to accept the terms of the April 29, 1997, letter detailed above. Mr. Agin testified that as part of his duties for the closing he was assigned the task of preparing, among other documents, the tenant estoppel certificates for the Westerville Beverage and Imobilaire III leases. On April 23, 1997, Mr. Agin, received the form for the tenant estoppel certificates from National City. According to his testimony, however, the information placed in the tenant estoppel certificates came from Ms. Blankenship.

On May 2, 1997, Mr. Agin forwarded by priority mail to Ms. Blankenship draft cop-

ies of the tenant estoppel certificates for the Westerville Beverage and the Imobilaire III leases. He also at that same time forwarded draft copies of the Assignment and Assumption of Real Estate Leases for the Westerville Beverage and Imobilaire III leases. For both the Westerville Beverage and Immobilaire III leases there were two tenant estoppel certificates, one to be signed by Mr. Davis on behalf of Immobilaire IV as the landlord and one to be signed by Mrs. Jerles as the landlord. As a result there was a total of four tenant estoppel certificates, and they were all prepared with a place for the signatures of the tenants, Westerville Beverage and Imobilaire III.

On May 7, 1997, Ms. Blankenship forwarded to Mr. Agin what appears to be edited copies of the draft documents prepared by Mr. Agin, including the drafts of the tenant estoppel certificates for the Westerville Beverage and the Immobilaire III leases. In a transmittal memorandum that purports to be signed by Ms. Blankenship it is stated: "Attached please find mark-up versions of the documents you drafted reflecting my comments for discussion. Please call to discuss." Ms. Blankenship, however, was not called as a witness to at least identify or explain her notations or to indicate whether she had any further discussions with Mr. Agin regarding the content of the tenant estoppel certificates. From this Court's review, however, the notes appear to be an effort to add information with reference to the true status of the Westerville Beverage lease, including the efforts to assign the lease to Mr. Tinnes.

It is also evident to the Court from a review of the draft tenant estoppel certificates that were sent to Ms. Blankenship, that Mr. Agin, apparently without any reservations, placed or allowed to be placed in them, information with reference to the true status of the leases. Inexplicably, this information included that not only was there a default on the part of Westerville Beverage with reference to the payment of utilities and real estate taxes, but that there was also an attempt to assign or sublet the lease, without the consent of the landlord. Significantly, what appear to be Ms. Blankenship's notations suggest an effort to further disclose the true status of the Westerville Beverage tenancy, and its assignment attempts.[1] The draft changes

---

1. For example, with reference to the Westerville Beverage lease tenant estoppel certificate that was drafted by Mr. Agin for the signature of Mr. Davis on behalf of Immobilaire IV as the landlord, the language included by Mr. Agin is in regular print, and the language apparently inserted by Ms. Blankenship is in bold print and all capitals as follows:

That said Lease is in full force and effect and that there are no defaults hereunder or any conditions which with only the passage of time or giving notice or both would become a default under the terms of said Lease, except as follows: Although their (sic) is currently no default as to rental payments, the Tenant is currently past due with respect to **PAYMENT OF** its agreed upon share of utilities and real estate (sic) taxes. In addition, the tenant has violated certain covenants in the Lease Agreement relating to assignment/**SUBLET** of the Lease.

That the undersigned have received no notice of a prior sale, transfer, assignment, hypothecation or pledge of said Lease or of the rents secured therein, except to Lender, other than the fact that the Tenant has violated certain covenants in the Lease Agreement by attempting to assign its obligations under the Lease **AND/OR SUBLET THE PREMISES** without consent of (the) Landlord.

With reference to the tenant estoppel certificate for the Westerville Beverage Lease to be signed by Mrs. Jerles as the landlord, the language included by Mr. Agin is in regular print, and the language apparently inserted by Ms. Blankenship is in bold print and all capitals as follows:

That said Lease is in full force and effect and that there are no defaults hereunder or

that were apparently provided by Ms. Blankenship are reflected in the tenant estoppel certificates that were executed at the closing.

In fact Mr. Agin testified that at the time of the closing he knew that someone other than Mr. Roessler was occupying the Emporium, and that this arrangement was part of the alleged lease default. Mr. Agin also testified that he was told prior to closing that there was a sublet in violation of the lease. Mr. Agin, however never talked to Mr. Tinnes or Mrs. Jerles. Mr. Agin testified that he never ordered any UCC searches prior to the closing, and he never attempted to obtain tenant estoppel certificates addressed to the Plaintiffs.

Mr. Agin testified that prior to the closing he informed the Plaintiffs that he was having trouble obtaining signed tenant estoppel certificates from Mr. Roessler. According to his testimony the Plaintiffs responded that they understood why Mr. Roessler would be reluctant to sign since he was in default, and he had attempted to assign without proper authorization. Also, according to Mr. Agin, the Plaintiffs responded that he should not be concerned since they had assurances from Mr. Jerles.

This testimony, however, appears to be in conflict with that of Dr. Davis who testified that he was never told by Mr. Agin that on the day before the closing Mr. Agin faxed the estoppel certificates to Mr. Roessler who did not sign. It also appears to be in conflict with the testimony of Mr. Davis who testified that as the closing drew near, he became concerned with the statements of Mr. Tinnes that were emphatic that he was buying the Emporium. Such statements even prompted him to again call Mr. Jerles, and then Mr. Agin, who assured him that prior to closing there would be "guarantees" in place. Mr. Agin explained in this testimony that based upon the information he had, he thought and advised the Plaintiffs that they would be able to evict the occupant of the Emporium.

On May 12, 1997, Mr. Agin corresponded with Ms. Blankenship, and he indicated that there were certain changes to documents delivered to him on May 7, 1997. There is no mention in this letter, however, of any questions about or changes to the tenant estoppel certificates. Seven days later, on May 19, 1997, Mr. Agin corresponded with Ms. Blankenship to transmit for the signature of Mr. and Mrs. Jerles several documents, including the tenant estoppel certificates for the Westerville Beverage and Immobilaire III leases. Then on May 21, 1997, one day prior to the scheduled closing, Mr. Agin corresponds by telecopier with Mr. Roessler in relevant part as follows:

> *Pursuant to Section 19 of the Lease Agreement between Westerville Beverage, Inc. and Christy Jerles, please exe-*

any conditions which with only the passage of time or giving notice or both would become a default under the terms of said Lease, except as follows: Although their (sic) is currently no default as to rental payments, the Tenant is currently past due with respect to **PAYMENT OF** its agreed upon share of utilities and real estates (sic) taxes. In addition, the tenant has violated certain covenants in the Lease Agreement relating to assignment of the Lease.

That the undersigned have received no notice of a prior sale, transfer, assignment, hypothecation or pledge of said Lease or of the rents secured therein, except to Lender, other than the fact that the Tenant has violated certain covenants in the Lease Agreement by attempting to assign its obligations under the Lease **AND/OR SUBLET THE PREMISES** without consent of (the) Landlord, **AND MORE OR LESS SIMULTANEOUSLY HEREWITHIN, LANDLORD IS ASSIGNING ITS INTEREST AS LANDLORD UNDER THE LEASE TO IMMOBILAIRE IV, LTD.**

*cute each of the following documents and return them to me* at the address below as well as fax them to Ms. Marie Malloy of National City Bank ... by 4:00 pm on Thursday, May 22, 1997. The documents included with this transmission are as follows: Assignment and Assumption of Real Estate Lease; *Estoppel Certificate of Landlord and Tenant with Christy Jerles; and Estoppel Certificate of Landlord and Tenant with Immobilaires* (sic) *IV, Ltd.* I would appreciate your prompt attention to this matter ... (emphasis supplied).

On May 22, 1997, the closing for the sale was conducted. Those parties attending included Mr. and Dr. Davis, Ms. Blankenship, Mr. Agin, Mr. Partridge, and Ms. Marie Malloy ("Ms. Malloy"), counsel for National City. Mr. and Mrs. Jerles were not physically present, however, Mr. Jerles called during some point in the closing process, according to Dr. Davis. It is important to note that the tenant estoppel certificates that were presented at closing were still not signed by Mr. Roessler on behalf of Westerville Beverage. In fact, Mr. Agin testified that he was surprised that National City allowed the transaction to close in light of this deficiency. On May 27, 1997, five days after the closing, the tenant estoppel certificates were even forwarded by Mr. Agin to Mr. Roessler by certified mail, return receipt requested.

According to Mr. Agin's testimony detailed above, the Plaintiffs did not expect Mr. Roessler to sign. Dr. Davis testified, however, that at the closing he told Mr. Agin that he was not signing anything without the Emporium, and it was at that point that Mr. Agin showed the tenant estoppel certificates and stated that they were the source of protection. Dr. Davis testified that during the closing he even specifically asked Mr. Again what had been done to protect him, and Mr. Agin in response explained the significance of the tenant estoppel certificates. Dr. Davis testified that Mr. Agin used the term "guarantee" with reference to the tenant estoppel certificates.

The testimony of Mr. Davis regarding the closing, likewise seems at variance with that of Mr. Agin. Mr. Davis testified that at the closing he was presented with documents showing that Westerville Beverage was the tenant and was in default, and he testified that he was presented the tenant estoppel certificate signed by Mrs. Jerles. According to his testimony, he asked why it was not signed by Westerville Beverage, but that Mr. Agin told him it was not a problem.

Regarding what National City knew prior to the closing, Mr. Partridge, testified that he had been told by Mr. Davis that Allen Tinnes was the new person operating the Emporium, and that he was doing well. Mr. Partridge testified, however, that he was not aware of any attempted assignment from Mr. Roessler to Mr. Tinnes. Mr. Partridge also testified that he was not aware that there had been any attempted waiver of defaults.

Turning to the knowledge of Mrs. Jerles at the time of the closing, she testified that she did not know the details of the sale transaction, and left such business details to Mr. Jerles. She initially testified that she had no present recollection of signing the tenant estoppel certificate for the Westerville Beverage lease, and took no steps to insure that the representations were accurate. She later also testified that she did not read the estoppel certificate for the Westerville Beverage lease before signing, and did not know whether there was any default at that time. Mrs. Jerles' lack of involvement was confirmed by Mr. Davis, who testified that she was not involved in any of the negotiations, and made no oral representations.

Once the transaction closed on May 22, 1997, the Plaintiffs and Rush Creek II were burdened with significant financial obligations that would prove impossible to cash flow. National City obtained a first mortgage in the amount of $1,050,000.00, and this mortgage was guaranteed by Imobilaire III and Mr. and Dr. Davis. A second mortgage was taken by Mr. and Mrs. Jerles in the amount of $ 1,045,-000.00. There was a $50,000.00 note between Mr. and Mrs. Jerles and Immobilaire IV, and a $20,000.00 note between Mr. and Mrs. Jerles and just Mr. Davis. These two notes were based upon unpaid rent from the signing of the lease in May 1996, until the closing of the sale, and also due to the mechanic's lien that was taken by the Electrical Connection, Inc.

The second mortgage and the $50,000.00 note were subject to a Guaranty Agreement executed by Mr. Davis, Dr. Davis and Imobilaire III. The payment on the first mortgage was approximately $11,900.00 per month, and the payment on the second mortgage was $10,912.15 per month. The monthly payment for the $50,000.00 note was in the amount of $4,384.18. The note for $20,000.00 was due in full on or before September 1, 1998. In stark contrast to the overwhelming obligations assumed by the Plaintiffs, Mr. and Mrs. Jerles received $222,807.72 in cash, eliminated their debt to National City in the amount of $766,907.13, and received the three promissory notes from the Plaintiff in the amounts of $1,045,000.00, $50,000.00 and $20,000.00.

Mr. Davis testified that shortly after the deed was filed, he went over to the Emporium to find Mr. Roessler to tell him he would be evicted. It was at this point, according to Mr. Davis, that Mr. Tinnes identified himself as the owner. At that time Mr. Tinnes also responded that he had a letter from Mr. Jerles approving his purchase and the assignment of the lease. Mr. Tinnes testified that Mr. Davis seemed surprised when he was told that he had purchased the business from Mr. Roessler.

Mr. Davis testified that as a result he called Mr. Jerles, who denied knowing Mr. Tinnes or awareness of any arrangement with Mr. Roessler. Mr. Davis then called Mr. Agin and Dr. Davis. One or two days later, Mr. Davis received from Mr. Tinnes a copy of the December 26, 1996, letter signed by Mrs. Jerles detailed above, and he asked Mr. Tinnes for more documents. He then called Mr. Agin. He also once more called Mr. Jerles and read the letter to him. According to Mr. Davis at that point Mr. Jerles responded that he recalled the letter, but stated that it was not giving Mr. Tinnes permission to operate the Emporium. Also, according to Mr. Davis, Mr. Jerles denied that the letter constituted a waiver of the defaults. At the end of this conversation, Mr. Davis responded that he was calling his lawyer, and he hung up. In the summer of 1997 Mr. Jerles was diagnosed with esophageal cancer.

To explain what steps he took to protect the Plaintiffs' interests, Mr. Agin testified that he was never told by Mr. Roessler or Ms. Blankenship of any attempted assignment of the lease. Mr. Agin explained that he understood that Mr. Tinnes was on the premises, and that Mr. Tinnes' presence was part of the defaults under the Westerville Beverage lease. On June 20, 1997, approximately one month after the closing, Mr. Agin took steps to confront Mr. Roessler on the tenancy issues. At that time he corresponded with a Mr. J. Jay Hampson, who served as counsel for Westerville Beverage. In this letter it is stated:

It is our understanding through (a) review of the documents and after dis-

cussions with Ms. Christy S. Jerles' attorney, that ... Westerville Beverage ... is still the lessee of the carry-out and deli located on the premise(s). It is also our understanding that your client made an attempt to assign its rights and obligation(s) under this Lease Agreement, which has not been entirely successful despite the fact your client sold its business operation at this location. As we can both agree, the current situation is not acceptable. Your client is technically still liable for any damages under the Lease Agreement. In addition, my client does not technically have a Lease Agreement with the current occupant of the carry out and deli (Emporium) ...

In this letter in order to address these problems, Mr. Agin sought to have the closing documents previously forwarded signed by Mr. Roessler, including the tenant estoppel certificates. In addition, Mr. Agin forwarded a Mutual Release and Lease Agreement Termination in order to terminate the lease relationship between Immobilaire IV and Westerville Beverage. The letter was closed with the statement that, "Once these documents have been fully executed, ... *(w)e will in turn execute a new lease with the current occupant* ..." (emphasis supplied). This language is a further indication to the Court that the Plaintiffs have taken actions in this case that are inconsistent with their stated intent to evict the Emporium tenant.

In June 1997, Mr. Agin prepared for forwarding to Mr. Tinnes a new lease for the Emporium, contrary to the position of the Plaintiffs that they intended to evict the Emporium tenant. Mr. Agin in his testimony opined that they erred in offering Mr. Tinnes a new lease. Rather than sign the new lease, Mr. Tinnes decided to obtain an attorney. On July 22, 1997, Mr. Agin wrote a letter to Mr. Tinnes to re-

voke the offer of a new lease, and to give thirty days notice to vacate the premises. In relevant part in this correspondence Mr. Agin stated:

As you are aware, when you purchased the business assets of Westerville Beverage ... you neglected to have (it) ... appropriately assign its lease with the current owners, Christy & Robert Jerles to you. (O)n May 22, 1997, my client, Immobilaire IV ... purchased ... the real estate ... As a part of the purchase, Christy & Robert Jerles assigned their interest in the lease they had with Westerville Beverage, Inc. to Immobilaire IV ... (O)n June 25, 1997, Westerville Beverage ... terminated the Lease Agreement for the property ... Therefore, (you are) ... currently occupying the premises ... without a lease.

In response on July 30, 1997, Mr. Agin received a letter from a Mr. James H. Gordon ("Mr. Gordon") who represented Mr. Tinnes. In relevant part Mr. Gordon responded regarding the tenancy rights of Mr. Tinnes as follows:

The basic premise of your letter is that the ... Lease Agreement ... of (the) former tenant Westerville Beverage ... was not appropriately assigned to Tinnes. To the contrary, a valid assignment occurred on December 27, (sic) 1996 by virtue of ... the Asset Purchase Agreement ... That assignment was restated in the Assumption and Indemnification Agreement dated January 2, 1997 ... *Finally, the former owners of the leasehold premises consented in writing to the assumption* ... Your client's purchase of the subject real estate from the Jerles was subject to the lease to Westerville Beverage which was properly assigned to Tinnes. Once the lease was assigned, Westerville Beverage had

nothing to terminate ... (emphasis supplied).

In addition, Mr. Gordon commented regarding the lack of disclosure to National City as follows:

> ...(I)t would appear that your client and Westerville Beverage have presented misleading information and documents to National City Bank relating to Tinnes' tenancy. While the respective goals of your client (obtaining financing) and of Westerville Beverage (release from the lease) are understandable, the methods were improper. This would probably be as much of a concern to the bank as it is to Tinnes.

On August 5, 1997, Mr. Agin responded to Mr. Gordon's letter, and in relevant part stated:

> When my client purchased the real estate ... it received representations and warranties from the Seller. In part these representations and warranties stated that Westerville Beverage ... was the Tenant *and that there had been no consent to any assignment to your client.* Obviously, the first time we saw Christy S. Jerles' December 26, 1997 letter was when it was attached to your letter. At this time I am awaiting a response from Christy S. Jerles' attorney regarding her clients' position and any additional information regarding the alleged consent to assignment. (emphasis supplied).

This correspondence does suggest that Mr. Agin may not have been aware of the December 26, 1996, document signed by Mrs. Jerles prior to the closing. Also, Mr. Tinnes confirmed that he never showed the December 26, 1996, letter to Mr. Davis prior to the closing. Rather, he recalled that he gave it to his attorney to forward to Mr. Davis after the threatened eviction. On the other hand, the correspondence also suggests that Mr. Agin was at least aware of the attempted assignment prior to the closing, as is further evidenced by the language that he allowed to be placed in the tenant estoppel certificates he was responsible for drafting, and the disclosure enhancements apparently authored by Ms. Blankenship.

It is significant to note that no testimony was presented from Ms. Blankenship as to whether she was at least aware of the December 26, 1996, letter prior to the closing, and whether it was at least shared with Mr. Agin. At a minimum, the Court finds that Mr. Agin was armed with enough doubt prior to the closing that with appropriate due diligence he should have discovered the December 26, 1996, correspondence. On August 20, 1997, in response to the Notice to Vacate, Mr. Tinnes filed a quiet title action.

Regarding the lack of complete disclosure to National City prior to the closing, Mr. Partridge testified that he was not informed of any plans to take over the Emporium until a November 7, 1997, meeting at Rush Creek II, approximately six months after the closing. At this meeting both Mr. Agin and the Plaintiffs' new attorney, a Mr. Scott W. Spencer ("Mr. Spencer"), were present. In Mr. Partridge's notes of this meeting he detailed that, "... Immobilaire's intended course of action is *to sue Tinnes to have him removed from the property, lose that suit, then sue Jerles for misrepresentation and seek to have Jerles' $1MM second mortgage relinquished as damages ...*" (emphasis supplied). Mr. Partridge testified that he was surprised to hear of the plans to operate the Emporium, and that he had never talked to Mr. or Mrs. Jerles about the Emporium lease.

As of November 26, 1997, Mr. Davis stopped paying Mr. and Mrs. Jerles. Approximately one month later on January 7,

1998, Mr. Davis corresponded with Mr. Jerles regarding the payment defaults. In this letter Mr. Davis stated:

> ...(O)ur Rush Creek ... operation has sustained a considerable decrease in sales. While the sports seasons are good, they fail in comparison to our summer months ... Take this, coupled with our continuing retirement of construction debt, and our lack of revenue from our original complex plan, and this will create certain cash flow problems ... If you should decide to exercise your desire to foreclose, you will discover that this will not be in anyones (sic) best interest and more than likely would drag out for sometime. Therefore, I strongly suggest that you continue with our present course and accept the rough times that have been placed upon us for this short period. In the longrun (sic) you will find it to be the right decision.

Inexplicably, in this letter there is no mention of Messrs. Tinnes and Roessler or the December 26, 1996, correspondence signed by Mrs. Jerles. Given the Plaintiffs' assertion that the eviction of the Emporium tenant was critical, it is difficult to understand why the alleged actions of Mr. and Mrs. Jerles would not have been questioned or at least discussed in this correspondence. The lack of any expression on this point appears inconsistent with the Plaintiffs' asserted eviction plans.

On February, 28, 1998, Mr. Jerles, died, and on March 31, 1998, summary judgment in the quiet title action was entered in favor of Mr. Tinnes on the basis that Mrs. Jerles had waived or consented to all of Westerville Beverage's breaches of its lease. Eight days later on April 8, 1998, the National City loan was declared as troubled. Also, at times money was taken from Rush Creek I to fund the operations of Rush Creek II. According to the testimony of Mr. Partridge, the projections used to approve the loan identified annual gross sales of between $2.6 and $3.1 million, but in 1997 Imobilaire III only grossed $1.6 million, even though rent was being received from the Emporium.

On May 22, 1998, with leave of court a third party complaint was filed in the quiet title action by Mr. and Dr. Davis and Immobilaire IV on the basis that they had been defrauded by the representation that Westerville Beverage was in default of its lease, and that it could be evicted. Four days later, on May 26, 1998, there was another meeting between Mr. Partridge and Mr. Davis. During this meeting it was disclosed that the sales and other taxes were delinquent, and that payments were not made to National City due to improvements to the second story bar operations and legal fees. At this time Mr. Davis also told him that his accountant was working on the financial statements. On June 1, 1998, National City declared the loan in default. Mr. Partridge called the Plaintiffs' accountant around June 3, 1998, regarding the missing financial statements, and was told that since the firm was not being paid, the financial statements were not completed. Around July 31, 1998, an employee of National City saw a notice of a federal tax lien filing in the Daily Reporter, and another meeting was held with Mr. Davis on August 3, 1998.

Two months later in October 1998, Mr. Partridge decided to contact Dr. Davis due to the loan defaults, and because Dr. Davis apparently was receiving payments from Rush Creek I or II. During this conversation Dr. Davis suggested the establishment of a replenishment account without the knowledge of Mr. Davis in order to maintain the payments to National City on a current basis. According to Mr. Partridge, Dr. Davis also stated that he wanted to get out of the investment. Mr. Davis

testified, however, that there was never an attempt to sale the Sunbury property.

On November 16, 1998, in response to the third party complaint, a counter claim was filed on behalf of the Defendants asserting that they were entitled to judgement on the promissory notes that were in default. On December 22, 1999, summary judgment was rendered in favor of the Defendants, and on February 13, 2001, the Court of Appeals for the Tenth District affirmed and reversed in part. In relevant part, the Defendants retained the judgement on their counterclaim, but the Court of Appeals held that there were genuine issues of material fact to be tried on the Plaintiffs' fraud claims. *Tinnes v. Immobilaire, IV, Ltd. et al. v. Jerles et al.,* 2001 WL 122073 (Ohio App. 10 Dist.2001). On June 27, 2001, the Supreme Court of Ohio declined to accept an appeal from the Tenth District decision. *Tinnes v. Immobilaire IV, Ltd.,* 92 Ohio St.3d 1432, 749 N.E.2d 758 (Ohio S.Ct.2001).

On April 19, 2001, a voluntary chapter 11 petition was commenced on behalf of Imobilaire III, and on May 22, 2001, a voluntary chapter 11 petition was commenced on behalf of Immobilaire, IV.[2] On August 20, 2001, this litigation was removed to this Court, and on April 22, 2003, the instant Complaint was filed. In the Complaint the Plaintiffs seek recovery based upon fraud, deceit, conspiracy and tortious damage to credit. The Plaintiffs'

entitlement to any recovery; however, is founded upon the allegation that the conduct of the Defendants was fraudulent and deceitful. On this basis, the Court has concluded that it is unnecessary to discuss the conspiracy and tortious damage claims, as well as issues related to damages.

■ Regarding fraud and deceit, the essence of the allegation is that the Plaintiffs were falsely told that Westerville Beverage was in default and could be evicted, although the Defendants had issued correspondence that refers to a waiver of the defaults and in some manner purports to approve the presence of Mr. Tinnes. To establish fraud the Plaintiffs must establish by a preponderance of the evidence the following elements:

1. A representation or where there is a duty to disclose, a concealment of facts;

2. The facts are material to the transaction at issue;

3. The representations were made falsely, either with knowledge of falsity or with reckless disregard;

4. The representations were made with intent to mislead;

5. There was justifiable reliance upon the representation or concealment; and

6. An injury was proximately caused by the reliance.[3]

2. On August 24, 2001, this court lifted the automatic stay to allow National City to foreclose, and the Sunbury property has been sold. Imobilaire III, however, continues to operate Rush Creek II on a month to month lease with the purchaser. Rush Creek II has continued its financial decline, and has accrued significant post petition tax obligations, while the Plaintiffs have pursued the instant litigation. On August 30, 2002, a voluntary chapter 11 petition was filed on behalf of Imobilaire, and in this bankruptcy proceeding

the Plaintiffs' first restaurant, Rush Creek I, was sold.

3. *Doyle v. Fairfield Machine Co., Inc.,* 120 Ohio App.3d 192, 206, 697 N.E.2d 667, 676 (Ohio App. 11th Dist.1997); *Burr et al. v. Board of County Commissioners of Stark County et al.,* 23 Ohio St.3d 69, 73, 491 N.E.2d 1101, 1105 (Ohio S.Ct.1986); *Greenberg et al. v. The Life Insurance Company of Virginia,* 177 F.3d 507, 515 (6th Cir.1999); *W.D.I.A. Corp., v. McGraw–Hill, Inc., et al.,* 34 F.Supp 2d 612, 626 (S.D.Ohio 1998), *aff'd* 202 F.3d 271 (6th Cir.2000), *Lepera et al. v.*

The claimed misrepresentation or concealment must be material, which has been defined as having the potential to influence the conduct of a reasonable person involved in the transaction, and regarding real property they must have an impact upon its character, utility and value.[4] Also, any misrepresentation must relate to, "... a fact which either exists in the present or has existed in the past."[5] In order to establish fraud there must be, "... direct evidence or justifiable inferences from established facts."[6] Circumstantial evidence, however, may be used to establish knowledge of the falsity of the representations and intent.[7] Proximate cause is established where the wrongful act, "... in a natural and continuous sequence produces a result which would not have taken place without the act ..." even where "... some other act unites with the original act to cause injury ..."[8]

On the issue of whether the reliance was justifiable, the focus is on whether the representations appear unreasonable, and whether there is no apparent reason to doubt the veracity.[9] In real estate transactions buyers must be vigilant, and utilize easily accessible information, and they cannot, "... rely on oral representations ... where the true facts are equally open to both parties ..."[10] Factors typically considered to establish justifiable reliance include: a) the nature of the transaction; b) the form and materiality of the representation; c) the relationship of the parties; d) the intelligence, experience, age and mental and physical condition of the parties; and e) their knowledge and source of knowledge.[11]

The primary concern of the law of deceit is to preserve the ability of parties to make business judgments without being led to make unwise choices that result in financial loss.[12] In order to es-

*Fuson et al.*, 83 Ohio App.3d 17, 23, 613 N.E.2d 1060, 1065 (Ohio App. 1st. Dist.1992); *Crown Property Development, Inc. v. Omega Oil Co.*, 113 Ohio App.3d 647, 656, 681 N.E.2d 1343, 1349 (Ohio App. 12th Dist. 1996); *Martin et al. v. Ohio State University Foundation, et al.*, 139 Ohio App.3d 89, 98, 742 N.E.2d 1198, 1205 (Ohio App. 10th Dist. 2000); *Petta v. Clarke*, 1997 WL 33295 (Ohio App. 9th Dist.1997); *Amerifirst Savings Bank of Xenia v. Krug et al.*, 136 Ohio App.3d 468, 490, 737 N.E.2d 68, 84 (Ohio App. 3rd Dist. 1999); *Brothers v. Morrone–O'Keefe Development Co., LLC*, 2003 WL 22999474 (Ohio App. 10th Dist.2003).

4. *Leal, et al. v. Holtvogt, et al.*, 123 Ohio App.3d 51, 76, 702 N.E.2d 1246, 1262 (Ohio App. 2nd Dist.1998); *Wickard, et al. v. Balazs, et al.*, 154 Ohio App.3d 429, 433, 797 N.E.2d 565, 567 (Ohio App. 6th Dist.2003) (citations omitted).

5. *Brevoort v. International Financial Resources, Inc., et al.*, 1993 WL 546579 (Ohio App. 10th Dist.1993). (citations omitted).

6. *Doyle v. Fairfield Machine Co., Inc., et al.*, 120 Ohio App.3d at 207, 697 N.E.2d at 677.

7. *Doyle v. Fairfield Machine Co., Inc., et al.*, 120 Ohio App.3d at 208, 697 N.E.2d at 677.

8. *Doyle v. Fairfield Machine Co., Inc., et al.*, 120 Ohio App.3d at 210–211, 697 N.E.2d at 679.

9. *Lepera, et al. v. Fuson, et al.*, 83 Ohio App.3d at 26, 613 N.E.2d at 1065; *Amerifirst Savings Bank of Xenia v. Krug*, 136 Ohio App.3d at 495, 737 N.E.2d at 87; *Crown Property Development, Inc. v. Omega Oil Co.*, 113 Ohio App.3d at 657, 681 N.E.2d at 1349; *Three–C Body Shops, Inc. v. Welsh Ohio, LLC*, 2003 WL 360958 (Ohio App. 10th Dist.2003); *Greenberg et al. v. The Life Insurance Co. of Virginia*, 177 F.3d at 516.

10. *Finomore v. Epstein*, 18 Ohio App.3d 88, 90, 481 N.E.2d 1193, 1196 (Ohio App. 8th Dist.1984).

11. *W.D.I.A. Corp. v. McGraw–Hill, Inc.*, 34 F. Supp 2d at 626.

12. *Davidson v. Hayes*, 69 Ohio App.3d 28, 31, 590 N.E.2d 18, 20 (Ohio App. 9th Dist.1990).

tablish deceit, which has several elements in common with fraud, the following factors must be proved by a preponderance of the evidence.

1. The existence of an actual misrepresentation or concealment;
2. A material fact is involved;
3. The misrepresentation was made with knowledge of its falsity;
4. There was intent to mislead another to rely;
5. There was actual reliance; and
6. An injury resulted from the reliance.[13]

In assessing the legal merits of the Plaintiffs' claims it is important to begin with the recognition that the dispute arises from the purchase of real estate, rather than the acquisition of a business. As a result, in this Order it is discussed in that context. Also, because of the significant similarities between the fraud and deceit claims, the Court will discuss them together.

The Court has described as much of the factual history as is practicable to provide some context for the allegations. Having gone through this exercise, however, the Court must note that the death of Mr. Jerles leaves significant questions unanswered. This is particularly the case, because Mrs. Jerles credibly testified that she left all the details of the transaction to Mr. Jerles. Also, it is clear from the record that she never made any oral representations. She merely signed a tenant estoppel certificate. According to her credible testimony she did not have any idea of its legal significance. Dr. Davis is similarly situated in that he left the details of the transaction and the operations to Mr. Davis.

The Court is left with no testimony from Mr. Jerles to explain what he may have told Mr. Davis, and what the Defendants intended by the December 26, 1996. letter, the related approval of the transfer of the liquor license and the subsequent acceptance of rent checks from Mr. Tinnes. Finally, there has been no testimony from the attorney that represented Mr. and Mrs. Jerles in the sale transaction.

While these gaps are significant, there are several critical factors bearing on fraud and deceit that are known. Those factors include:

1. Rush Creek II was opened only after a relatively limited experience with the operations of Rush Creek I;
2. The Plaintiffs were given an opportunity by Mr. Jerles not to proceed with the lease for the former Scoreboard portion when they discovered the damages that would significantly increase their renovation costs and substantially delay their opening;
3. From the beginning of Rush Creek II, the Plaintiffs were unable to meet all of their obligations, including significant renovation expenses and delinquent taxes;
4. A mere month after opening Rush Creek II, the Plaintiff's exercised their purchase option based upon the relatively high level of sales for that initial month and the resultant high rental charges;
5. Before the closing Mr. Davis was aware of the presence of Mr. Tinnes and his involvement in the operations of the Emporium as a purchaser. Mr. Davis at that same time was aware that Mr. Tinnes expected to be offered a new lease by Mr. Davis. Mr. Davis, however, never

13. *Pappas Realty Co. v. Wharton,* 1984 WL 5175 (Ohio App. 9th Dist.1984); *Crum, et al.* v. *McCoy, et al.,* 41 Ohio Misc. 34, 39, 322 N.E.2d 161, 165 (Ohio Municipal Ct.1974).

confronted Messrs. Roessler and Tinnes prior to the closing;

6. Before the closing Mr. Agin was also aware of the presence of Mr. Tinnes and the attempted assignment. Mr. Agin never sought to evict Mr. Tinnes prior to closing, or sought to make sure that the tenant estoppel certificates were signed by Westerville Beverage prior to any closing; and

7. While Mr. Davis has expressed a strong desire to develop a drive through on the Sunbury Property and to operate the Emporium, none of these plans were presented to National City at the time of the loan. In fact, his statements to National City, contacts with Mr. Tinnes, and correspondence with Mr. Jerles appear inconsistent with this stated goal.

On the issue of false representations or concealment with reference to Mrs. Jerles, the Plaintiffs are unable to point to any oral statements. Instead they are left with the representations contained in a tenant estoppel certificate. This document, which was addressed to National City and not the Plaintiffs, was prepared by Mr. Agin whom represented the Plaintiffs. In the Court's view the fact that he may have obtained the information from Ms. Blankenship does not eliminate his responsibility to make sure his clients interests were protected. As indicated above, the tenant estoppel certificate contained a clear reference to the existence of an attempted assignment by Westerville Beverage. In fact, the attorney for the Jerles appeared to attempt to amplify the level of disclosure on this very point. Under these circumstances, the Court cannot find that the Plaintiffs have sustained their burden in proving that Mrs. Jerles engaged in attempts to misrepresent or conceal.

With reference to the alleged representations made by Mr. Jerles, the Court also finds that the Plaintiffs have failed to sustain their burden of proof by a preponderance of the evidence. Regarding misrepresentations, while Mr. Davis is adamant that Mr. Jerles told him that Westerville Beverage was the tenant and was in default, and other witnesses provide some corroboration, his own actions are inconsistent with someone that is armed with this information. For example, he does not tell National City or discuss the issue with Messrs. Roessler or Tinnes. Also, the Plaintiffs did not offer any testimony from Ms. Blankenship, who may have been able to corroborate Mr. Davis' assertions. Regarding concealment, the Plaintiffs have also failed to sustain their burden. There were so many red flags prior to the closing starting with something as obvious as the presence of Mr. Tinnes and the absence of Mr. Roessler. These facts were readily apparent to the Plaintiffs and their attorney, Mr. Agin, prior to the closing.

Even assuming that the alleged representations were made by Mr. Jerles and that he engaged in concealment, the Court concludes that the Plaintiffs have also failed to establish that any such actions were material to the transaction. While Mr. Davis testified that he shared his plan of evicting Westerville Beverage and operating the Emporium with many, including Mr. Jerles, this information was never conveyed to National City that held the first mortgage. In fact, the record shows that National City was not told until months after the closing, and at the time the Plaintiffs were engaged in efforts to evict Mr. Tinnes and commence litigation against the Jerles.

In addition, the loan documentation prepared by National City shows that the

**162**

overall transaction made economic sense based upon the significant annual rental revenues from the Emporium in the approximate amount of $50,000.00. Mr. Davis' letter to National City references the rental revenues. His correspondence to Mr. Jerles details his plan to cooperate with the tenant of the Emporium. Further, Mr. Davis in his contacts with Mr. Tinnes prior to closing did nothing to dissuade him from the belief that he would be offered a new lease after the closing.

■ The next two essential elements of the Plaintiffs' fraud and deceit claims are that false representations were made knowingly or with reckless disregard, and that there was an intent to mislead. These elements essentially require this Court to examine the actions of the parties and their motives. The key question is what were the Defendants attempting to do by simultaneously entering into the lease with an option to purchase with the Plaintiffs while issuing the December 26, 1996, letter to Mr. Tinnes.

One theory may be that they acted to defraud and deceive the Plaintiffs by entering into the transaction with Mr. Tinnes and Roessler, while concealing from the Plaintiffs the identity and default status of the tenant. The motivations might be the desire to unload the Sunbury property that was being managed by Mr. Jerles from South Carolina, and that had two problem tenants. The sale undoubtedly significantly benefitted the Defendants, including the retirement of $766,907.13 in debt to National City, and the receipt of the sum of $222,807.72 in cash and three promissory notes.

An alternative theory is that the Defendants were acting to merely allow Mr. Tinnes to stay in possession until the terms of a lease could be worked out with them if the purchase option was not exercised, or with the Plaintiffs if they decided to exercise the option earlier. The motivations may include the desire to retain a tenant for the Emporium that was able to operate and continue to make rental and utility payments to help defray the mortgage on the Sunbury property.

In the absence of Mr. Jerles, who was most involved in the transaction, or even his counsel, this Court cannot conclusively discern which theory of the Defendants' motivations is correct. Further, a question that remains unanswered is to what extent Mr. Jerles' health may have influenced the communications and contractual relationships between the parties. What is clear to the Court, however, is that the Defendants would not benefit by having Rush Creek II fail, since this was the primary source of payment for their second mortgage and the promissory notes. Also, any failure of Rush Creek II would end with Mr. Jerles having to again cope with from South Carolina troubled real estate interests in Columbus. Further, the Defendants' collection remedies were circumscribed by those of National City.

According to Mr. Davis, it was Mr. Jerles that insisted that the Plaintiffs should lease before they purchased, to make sure they could run the second restaurant. Mr. Jerles even declined to discuss a proposed purchase of the Sunbury property by Mr. Tinnes, in view of his negotiations with Mr. Davis. The Court has concluded that such actions are not consistent with the theory that Mr. Jerles would deliberately proceed in a manner that would result in the failure of the Plaintiffs' operations at Rush Creek II.

From all of these facts, the Court is unable to discern any significant relative benefit the Defendants would derive by entering into a transaction that would automatically lead to the failure of Rush Creek II, and that would make it impos-

sible for the Plaintiffs to meet their obligations to National City and the Defendants. On these bases, the Court concludes that the Plaintiffs have failed to establish that false representations were knowingly or recklessly made with intent to mislead.

 The final elements of the fraud and deceit claims, reliance and proximate causation, require this Court to scrutinize what actions the Plaintiffs took to preserve their interests, and whether any harm was caused by the alleged actions of the Defendants. On the issue of reliance, first the Court cannot discern any significant disparity in the level of sophistication between Messrs. Jerles and Davis. From the negotiation correspondence reviewed by the Court it is apparent that they were both familiar with the details of the transaction and were acting to preserve their best interests. In addition, when it came time to purchase the Sunbury property, both the Plaintiffs and Defendants were represented by separate counsel. Further, Mr. Davis from May 1, 1996 when the lease became effective to early December 1996 when the option to purchase was exercised, was on the premises and had contact with Mr. Tinnes. He had an opportunity to observe the operations of the Emporium. He was in a unique position to continue his due diligence, and to make sure that any of the alleged representations made by Mr. Jerles were true.

After the option was exercised, Mr. Agin was also aware of the attempted assignment. He could have recommended to the Plaintiffs that they have Mr. Tinnes evicted or obtain some additional information and formal assurances from the Defendants and Messrs. Roessler and Tinnes. During the approximately five months between the exercise of the option and the closing on May 22, 1997, such actions may have precluded any need for the instant litigation. Instead, the Court has been presented with conflicting testimony from the Plaintiffs and their own attorney as to their level of concern over the presence of Mr. Tinnes and the failure of Mr. Roessler to acknowledge any alleged lease defaults prior to the closing.

On these bases, the Court concludes that the Plaintiffs have failed to establish actual or justifiable reliance. Instead, the Court concludes that the Plaintiffs placed their reliance upon their counsel to take the necessary steps to insure that they could gain control over the operations of the Emporium through an eviction or otherwise, after the closing.

 Finally, on the issue of whether the alleged actions of the Defendants caused any injury, the Court also concludes that the Plaintiffs have failed to sustain their burden. Based upon this Court's review of the evidence, any injury suffered by the Plaintiffs is not the result of fraud or deceit, but rather results from an overly enthusiastic assessment of profitability, and a poorly conceived, undercapitalized and poorly executed business transaction.

As indicated above, the Plaintiffs decided to open a second restaurant after a relatively limited experience with the first. On the day of possession, the Plaintiffs found significant damages that substantially increased their renovation costs and the time required to open and start producing income. Rather than accept Mr. Jerles' offer to let them out of the lease, they start renovating to the tune of approximately $700,000.00 and open six months later. After one month of relatively high sales they decide to exercise the option to purchase. Meanwhile, there are unpaid tax bills, a mechanic's lien and unpaid rent and real estate taxes that all had to be addressed at closing, and resulted in two additional promissory notes.

After the closing of the transaction and the initial months of operations, the sales continued to decline, and the Plaintiffs continued to be late on their mortgage payments. Even after the Plaintiffs were having difficulty meeting their mortgage obligations, they continued to renovate the upstairs of Rush Creek II. The Plaintiffs never attempted to market the Sunbury property. All of these factors lead the Court to conclude that the business transaction itself and the poor quality of the due diligence prior to the closing and the actions of the Plaintiffs and their counsel after the closing, are the causes of any injury to the Plaintiffs. The Court has concluded that this is not a case were injuries were caused by any alleged misrepresentations, concealment or deceit regarding the tenancy of the Emporium.

Accordingly, judgment on the Complaint is rendered in favor of the Defendants. This ruling makes it unnecessary to discuss any other issues raised by the parties.

**IT IS SO ORDERED.**